114 T.C. No. 25


UNITED STATES TAX COURT


THOMAS P. AND ERMINA A. KRUKOWSKI, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 7765-98.                     Filed May 22, 2000.

        P was the sole shareholder of two C corporations.
One corporation operated a health club; the other
operated a law firm for which P worked as an attorney.
P realized a loss renting a building to the health
club, and he realized income renting a building to the
law firm.  P's 1994 Federal income tax return reported
that the loss and income were both "passive" under sec.
469, I.R.C., and that the loss offset part of the
income.  R disallowed the offset because, R determined,
the recharacterization rule of sec. 1.469-2(f)(6),
Income Tax Regs., deemed the income nonpassive.  <u>Held</u>:
The recharacterization rule is valid.  <u>Held</u>, <u>further</u>,
the written binding contract exception of sec. 1.469-
11(c)(1)(ii), Income Tax Regs., is inapplicable to the
facts herein.  <u>Held</u>, <u>further</u>, the transitional rule of
sec. 1.469-11(b)(1), Income Tax Regs., does not operate
to avoid application of the recharacterization rule.

Victor A. Kornis, for petitioners.

Christa A. Gruber, for respondent.

OPINION

LARO, Judge:  This case is before the Court on cross-motions for summary judgment.  Respondent determined a $28,184 deficiency in petitioner's 1994 Federal income tax and a $5,637 accuracy-related penalty under section 6662(a).  Petitioner, while residing in Greendale, Wisconsin, petitioned the Court to redetermine respondent's determination.

Following respondent's concession that petitioner is not liable for the accuracy-related penalty, we must decide whether petitioner may offset the income and loss that he realized on his separate rental activities.[1]  We hold he may not.  Unless otherwise stated, section references are to the Internal Revenue Code applicable to 1994.  Rule references are to the Tax Court Rules of Practice and Procedure.  We refer to Thomas P. Krukowski as the sole petitioner.

Background

Petitioner is the president and sole shareholder of two subchapter C corporations.  One corporation (the health club)

---

[1] Petitioner asserts that he treated the separate rental activities as a single activity under sec. 1.469-4(c)(1), Income Tax Regs.  The record does not support this assertion.  To the contrary, the record reveals that petitioner treated his rental activities as separate activities.

operates a health club.  The other corporation (the law firm) operates a law firm.  Petitioner actively works for the law firm as an attorney.

Petitioner rents a building (the club) to the health club, and he rents a second building (the office building) to the law firm.  Petitioner's 1994 Federal income tax return reported that: (1) He realized a $69,100 loss on the rental of the club, (2) he realized income of $175,149 on the rental of the office building, (3) the rental of the club and the rental of the office building were separate passive activities under section 469, and (4) the loss from one activity offset an equal amount of the income from the other activity, resulting in the inclusion in petitioner's 1994 taxable income of $106,049 of rental income.  Respondent determined that the rental income could not partially be offset by the rental loss; respondent determined that the income was recharacterized as nonpassive income under section 1.469-2(f)(6), Income Tax Regs.,[2] because petitioner materially participated in

_____

[2] The recharacterization rule of sec. 1.469-2(f)(6), Income Tax Regs., provides:

> (f)(6) <u>Property rented to a nonpassive activity.</u> An amount of the taxpayer's gross rental activity income for the taxable year from an item of property equal to the net rental activity income for the year from that item of property is treated as not from a passive activity if the property--
>
>> (i) Is rented for use in a trade or business activity * * * in which the taxpayer materially
>> (continued...)

the law firm's business activity.  Respondent determined that
petitioner's 1994 taxable income includes $175,149 (rather than
the reported $106,049) of rental income.

Petitioner leased the office building to the law firm on
March 1, 1987, pursuant to a written, 5-year lease (the 1987
lease) that provided for monthly rent of $17,500.  The 1987 lease
contained the following renewal provision:

### 24.  OPTION TO RENEW

Lessor grants to Lessee three (3) consecutive
options to renew this Lease, each for a term of three
(3) years, at a rental to be mutually agreed to by
Lessor and Lessee prior to the commencement of a
renewal term with respect to that renewal term, with
all other terms and conditions of the renewal lease to
be the same as those herein.  To exercise this option,
Lessee must:

(1) give Lessor written notice of the
intention to do so at least 60 days before initial
term expires, and

(2) agree with Lessor on rental for renewal
period at least 30 days before initial term
expires.

In Lessor's sole discretion, failure to comply with either
(1) or (2) above shall cause the option to renew to become
null and void.

On December 27, 1991, petitioner and the law firm executed a
document entitled "Lease Renewal" (the 1991 lease), pursuant to

---

[2](...continued)
participates (within the meaning of sec. 1.469-5T)
for the taxable year * * *  [Sec. 1.469-2(f)(6),
Income Tax Regs.]

the option provision in the 1987 lease.  The 1991 lease provided in full:

### Lease Renewal

Lease Renewal made this 27 day of December 1991 between Thomas P. Krukowski, of Greendale, Wisconsin, herein referred to as "Lessor" and Krukowski & Costello, S.C., of Milwaukee, Wisconsin, herein referred to as "Lessee".

Pursuant to Paragraph 24 entitled "Option to Renew" in the Lease dated March 1, 1987 between Lessor and Lessee (the "Lease"), Lessee hereby gives written notice of its intention to exercise the <u>first</u> three year option to renew the Lease.

The term of the Lease will be extended from March 1, 1992 until February 28, 1995 and all other terms and conditions of the Lease shall remain the same including the monthly rent of $17,500.00.

LESSEE:

KRUKOWSKI & COSTELLO, S.C.

BY: <u>s/_____</u>
Timothy G. Costello, Secretary

Agreed to and Accepted this 27 day of December 1991

<u>s/_____</u>
Thomas P. Krukowski, Lessor

### Discussion

The parties agree that we may decide this case by way of summary judgment because, they assert, the dispositive issues are purely legal.  We agree that our decision herein turns entirely on legal determinations, and, hence, that we may decide this case summarily.  Summary judgment is appropriate where, as here, "the pleadings, answers to interrogatories, depositions, admissions,

and any other acceptable materials, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that a decision may be rendered as a matter of law." Rule 121(b); see P & X Mkts., Inc. v. Commissioner, 106 T.C. 441, 443 (1996), affd. without published opinion 139 F.3d 907 (9th Cir. 1998); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-251 (1986).

Petitioner challenges the ability of the Commissioner to apply the recharacterization rule to the rental income from the office building.  Petitioner argues primarily that the recharacterization rule is invalid because it conflicts with explicit statutory text as to the characterization of income derived from a rental activity.  Petitioner observes that section 469(c)(2) and (4) provides that a rental activity is generally passive and that the recharacterization rule provides that certain rental income is nonpassive.

We disagree with petitioner that the recharacterization rule is invalid.  The recharacterization rule is a legislative regulation, see Schwalbach v. Commissioner, 111 T.C. 215, 220 (1998) (the Secretary had to comply with the Administrative Procedure Act (APA), 5 U.S.C. sec. 553(b) and (c) (1994), when he prescribed sec. 1.469-2(f)(6), Income Tax Regs., because the rules contained therein are legislative rather than interpretative); see also Fransen v. United States, 191 F.3d 599,

600 (5th Cir. 1999); thus, it is invalid only if it is arbitrary, capricious, or manifestly contrary to the statute, see Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 844 (1984); see also McKnight v. Commissioner, 99 T.C. 180, 183 (1992).

The rechacterization rule is not arbitrary, capricious, or manifestly contrary to the statute.[3]  It was prescribed by the Secretary pursuant in part to the specific grant of authority stated in section 469(l) that allows him to prescribe all necessary or appropriate regulations to carry out the provisions of section 469, including regulations:  (1) Defining the terms "activity" and "material participation", sec. 469(l)(1), and (2) "requiring net income or gain from a limited partnership or other passive activity to be treated as not from a passive activity", sec. 469(l)(3).  The rule is tied directly to the following passage set forth by the conferees in their report as to the Secretary's regulatory authority under section 469:

> Regulatory authority of Treasury in defining non-passive income.--The conferees believe that clarification is desirable regarding the regulatory authority provided to the Treasury with regard to the definition of income that is treated as portfolio income or as otherwise not arising from a passive activity.  The conferees intend that this authority be exercised to protect the underlying purpose of the passive loss provision, i.e., preventing the sheltering

---

[3] The Court of Appeals for the Fifth Circuit has so concluded.  See Fransen v. United States, 191 F.3d 599 (5th Cir. 1999).

of positive income sources through the use of tax losses derived from passive business activities.

Examples where the exercise of such authority may (if the Secretary so determines) be appropriate include the following * * * (2) related party leases or sub-leases, with respect to property used in a business activity, that have the effect of reducing active business income and creating passive income * * *. [H. Conf. Rept. 99-841, at 147, 1986-3 C.B. (Vol. 4) 1, 147.]

Petitioner also argues that the recharacterization rule is inapplicable to this case by virtue of section 1.469-11(c)(1)(ii), Income Tax Regs., which provides that the rule does not apply to income "attributable to the rental of * * * property pursuant to a written binding contract entered into before February 19, 1988." Petitioner asserts that the office building lease in effect during 1994 was the 1987 lease, or, in other words, that he leased the office building to the law firm during 1994 pursuant to a pre-February 19, 1988, written binding contract. We disagree. As discussed below, we conclude that the office building lease in effect during 1994 was the 1991 lease and, moreover, that the 1991 lease and the 1987 lease are separate contracts.

Applicable State (Wisconsin) law characterizes the 1991 lease as a renewal (as opposed to an extension) of the 1987 lease, which, in turn, means that the 1991 lease is a contract separate from the 1987 lease. See Seefeldt v. Keske, 111 N.W.2d 574, 575-576 (Wis. 1961). We look at three critical factors to

determine whether a contract is renewed or extended under Wisconsin law and conclude therefrom that the 1991 lease is a renewal of the 1987 lease.

First, the language used in both leases by the parties thereto leads to the conclusion that the 1991 lease is a renewal of the 1987 lease. See id. at 576-577. The leases refer several times to a renewal; they refer only once to an extension.

Second, the parties' conduct leads to the same conclusion. See id. The 1991 lease was signed by an officer of the law firm (other than petitioner) as "Lessee", and it was signed by petitioner as "Lessor", under the heading "Agreed to and Accepted". If the parties to the leases had intended that the lessee could extend the 1987 lease at its option, petitioner's signature and agreement would have been unnecessary.

Third, the fact that petitioner, as the office building's lessor, had to perform a further act to lengthen the term of the 1987 lease also leads to the conclusion that the 1987 lease was renewed through the 1991 lease. Compare Milwaukee Hotel Wis. Co. v. Aldrich, 62 N.W.2d 14 (Wis. 1953) (lease providing for initial term of 3 years could be extended at lessee's option for 3 more years at rent stated in lease; held, lease is a 6-year lease because no further act required of lessor once lessee makes election), with St. Regis Apt. Corp. v. Sweitzer, 145 N.W.2d 711 (Wis. 1966) (2-year lease automatically renews for 2 more years

if neither party gives contrary notice; held, lease is 2-year lease because either party can prevent renewal by giving notice). See also Sheppard v. Rosenkrans, 85 N.W. 199 (Wis. 1901). Petitioner, as lessor, had to agree with the lessee/law firm as to the rent that would be payable for any additional rental period after the first 5 years. Moreover, if they were unable to reach such an agreement at least 30 days before the 5-year period expired, petitioner possessed the sole discretion to declare the option to renew null and void.

We also bear in mind that the absence in the 1987 lease of an agreed-upon rent for the renewal period made the 1987 lease unenforceable for any period after the 5-year period expired. See Wis. Stat. Ann. sec. 704.03(1) (West 1998) (Wisconsin statute of frauds provides that a lease for more than a year, or a contract to make such a lease, is unenforceable unless it sets forth the amount of rent or other consideration). In fact, an enforceable contract for the additional period did not exist until December 27, 1991, when the parties agreed on a rent for the renewal period and created a writing memorializing that new agreement. See Borkin v. Alexander, 132 N.W.2d 587 (Wis. 1965); Ratcliff v. Aspros, 35 N.W.2d 217 (Wis. 1948).

Petitioner also argues that he is not subject to the recharacterization rule by virtue of section 1.469-11(b)(1), Income Tax Regs., which allows taxpayers, at their option, to use

certain proposed regulations to ascertain their tax liability for years ending after May 10, 1992, and beginning before October 4, 1994. See sec. 1.469-11(b)(1), Income Tax Regs. These proposed regulations (the 1992 proposed regulations) were prescribed by the Secretary in 1992 to define the word "activity" for purposes of the passive loss rules. Notice of Proposed Rulemaking, PS-1-89, 1992-1 C.B. 1219, 57 Fed. Reg. 20802 (May 15, 1992). Petitioner argues that the 1992 proposed regulations preclude a shareholder from participating in the activities of a C corporation, which, petitioner concludes, means that the recharacterization rule cannot be applied to his 1994 income from the office building.

We disagree with petitioner's assertion that section 1.469-11(b)(1), Income Tax Regs., precludes taxpayers from participating in activities conducted by C corporations. Our conclusion is driven by a plain reading of the relevant text; namely, section 469(a)(2)(A) and (h)(1) and section 1.469-2(f)(6)(i), Income Tax Regs. See Commissioner v. Soliman, 506 U.S. 168, 174 (1993); Crane v. Commissioner, 331 U.S. 1, 6 (1947); Venture Funding, Ltd. v. Commissioner, 110 T.C. 236, 241-242 (1998), affd. without published opinion 198 F.3d 248 (6th Cir. 1999). Section 469(a)(2)(A) provides in relevant part that the passive activity rules apply to "any individual". Section 469(h)(1) provides in relevant part that an individual is treated as materially participating in an activity when he or she "is

involved in the operations of the activity on a basis which is * * * regular, * * * continuous, and * * * substantial".[4]  Section 1.469-2(f)(6)(i), Income Tax Regs., provides in relevant part that rental income is recharacterized as nonpassive income if the underlying property "Is rented for use in a trade or business activity * * * in which the taxpayer materially participates", sec. 1.469-2(f)(6)(i), Income Tax Regs.

Nowhere in section 469 or the regulations thereunder do we read, as petitioner asks us to hold, that an individual's "regular", "continuous", and "substantial" involvement in the operations of an activity is not treated as materially participating in that activity when the activity is operated by a C corporation.  Petitioner correctly observes that the Secretary had set forth such an exception in two sets of temporary regulations that he had prescribed before 1992.  In 1988, the Secretary prescribed section 1.469-5T(f)(1), Temporary Income Tax Regs., 53 Fed. Reg. 5686, 5726 (Feb. 25, 1988), (the 1988

_____

[4] Although we understand the words "regular", "continuous", and "substantial" to support a finding that petitioner materially participated in the law firm's business activity, we note that petitioner also meets the definition of the term "material participation" as set forth in the applicable regulations.  Sec. 1.469-5T(a) and (d), Temporary Income Tax Regs., 53 Fed. Reg. 5686 (Feb. 25, 1988) (an individual materially participates in an activity if, inter alia, he or she participates in an activity for more than 500 hours in the taxable year, he or she participates in the activity for more than 100 hours in the taxable year and no other individual spends more time in the activity, or the activity involves the performance of legal services and the individual had materially participated in the activity during any 3 years prior to the year in question).

temporary regulations), providing that "any work done by an individual * * * in connection with an activity in which the individual owns (directly or indirectly, other than through a C corporation) an interest at the time the work is done shall be treated for purposes of this section as participation of such individual in the activity."  One year later, in 1989, the Secretary prescribed section 1.469-4T(b)(2)(ii)(B), Temporary Income Tax Regs., 54 Fed. Reg. 20527, 20543 (May 12, 1989) (the 1989 temporary regulations), providing that "For purposes of applying section 469 and the regulations thereunder, a taxpayer's activities do not include operations that a taxpayer conducts through one or more entities (other than passthrough entities)."

As part of the regulatory project underlying the 1989 temporary regulations, the Secretary also amended the 1988 temporary regulations (the amended 1988 temporary regulations) to delete the parenthetical exception "(directly or indirectly, other than through a C corporation)" from section 1.469-5T(f)(1), Temporary Income Tax Regs.  Sec. 1.469-5T(f)(1), Temporary Income Tax Regs.  On May 15, 1992, the Secretary finalized the amended 1988 temporary regulations as section 1.469-5(f)(1), Income Tax Regs. (the 1992 final regulations), leaving them virtually unchanged in their final form.  Two years later, in 1994, the Secretary finalized a substantially revised version of the 1992 proposed regulations as section 1.469-4, Income Tax Regs. (the 1994 final regulations).

The 1988 temporary regulations (prior to the 1989 amendment) and the 1989 temporary regulations are not applicable to the year at bar.[5] The applicable rules are found in: (1) The 1992 proposed regulations, (2) the 1992 final regulations, and (3) the 1994 final regulations. The 1994 final regulations do not help petitioner's cause because they provide specifically that "A taxpayer's activities include those conducted through C corporations that are subject to section 469".[6] Sec. 1.469-4(a), Income Tax Regs. Nor are the 1992 final regulations of any help to petitioner; as mentioned above, the parenthetical exception "(directly or indirectly, other than through a C corporation)" does not appear in those regulations. The 1992 proposed regulations also do not help petitioner's cause; the 1992 proposed regulations do not contain the exception set forth in the 1989 temporary regulations.

Petitioner looks to the fact that the 1992 proposed regulations did not affirmatively and expressly disavow the exception set forth in the 1989 temporary regulations, and he discerns therefrom that the exception continued to exist in 1992.

---

[5] For completeness, we note that the Secretary allowed the 1989 temporary regulations to expire on May 11, 1992, under the sunset provision of sec. 7805(e)(2). See 57 Fed. Reg. 20803 (May 15, 1992).

[6] Neither party disputes that the corporation operating the law firm is a C corporation subject to sec. 469. See sec. 1.469-1T(b)(4) and (5), Temporary Income Tax Regs., 53 Fed. Reg. 5686, 5701 (Feb. 25, 1988) (a C corporation is subject to sec. 469 if it is a "Personal service" or "Closely held" corporation.

We disagree. The fact that the Secretary did not re-prescribe that exception as part of the 1992 proposed regulations is persuasive evidence that he revoked the exception at that time. See Keppel v. Tiffin Sav. Bank, 197 U.S. 356, 373 (1905) ("it cannot in reason be said that the omission * * * gives rise to the implication that it was the intention of Congress to reenact it."); Independent Ins. Agents of Am., Inc. v. Clarke, 955 F.2d 731, 735 (D.C. Cir. 1992) ("Under traditional rules of statutory construction, * * * material omitted on reenactment is deemed repealed."), revd. on other grounds sub nom. United States Natl. Bank v. Independent Ins. Agents of Am., Inc., 508 U.S. 439 (1993). See generally Singer, Sutherland Statutory Construction, sec. 23.28, at 413 (5th ed. 1993). As we observed in Schwalbach v. Commissioner, 111 T.C. 215, 228 (1998): "Although the * * * [1992 proposed regulations were] silent on this rule, including whether the Commissioner was considering abandoning it, we read nothing in * * * [those] regulations that would lead us to believe that the Commissioner was proposing to retain the rule."

The facts of Schwalbach v. Commissioner, supra, are similar to the facts at bar. There, the taxpayers challenged the Commissioner's application of the recharacterization rule to income they had realized in 1994 on their rental of property to a corporation owned by 2 shareholders, one of whom was one of the taxpayers. The taxpayers argued primarily that the recharacterization rule was invalid because the Secretary did not

comply with the APA when he prescribed section 1.469-4(a), Income Tax Regs.; if the Secretary had not complied with the APA, the taxpayers argued, then the recharacterization rule was invalid as applied to them.  We concluded that the Secretary met the APA's requirements; in so doing, we analyzed the statutory text, relevant legislative history, and various regulations prescribed under section 469.

The taxpayers in Schwalbach also advanced an alternative argument that is the same argument that petitioner advances herein.  The taxpayers in Schwalbach argued on brief:

> in the event it is redetermined the provisions of
> Treas. Reg. Sec. 1.469(d)(5) [sic] apply, the
> provisions of Treas. Reg. Sec. 1.469-4T(b)(2)(ii)(B)
> should be available to petitioners through 1994 due to
> the continued confusion with respect to provisions of
> the May, 1992, proposed regulations and the absence of
> a definitive statement as regards a non-passthrough
> entity not conducting passive activities through
> itself.  See, effective date and transition rules under
> Treas. Reg. Sec. 1.469-11(b)(1).

We rejected this argument summarily, holding that nothing in section 1.469-11, Income Tax Regs., allowed us to apply the exception appearing in the pre-1992 regulations under which a taxpayer would not be considered to be a material participant of an activity conducted through a C corporation.  See Schwalbach v. Commissioner, supra at 230.  We stated:

> we decline petitioners' invitation to allow them to
> apply the rules of section 1.469-4T(b)(ii)(B),
> Temporary Income Tax Regs., 54 Fed. Reg. 20543, in lieu
> of the rules stated in section 1.469-4(a), Income Tax
> Regs.  Simply put, the effective date and transition
> rules related to the regulatory rules under section 469

> do not allow them to use it [i.e., the only rule stated in sec. 1.469-4T(b)(ii)(B), Temporary Income Tax Regs., 45 Fed. Reg. 20543 (May 12, 1989), namely, that "a taxpayer's activities do not include operations that the taxpayer conducts through one or more entities (other than passthrough entities)."]. See sec. 1.469-11, Income Tax Regs. [Id.]

Although we recognize that section 1.469-11(b)(1), Income Tax Regs., does not explicitly reference section 1.469-4T(b)(ii)(B), Temporary Income Tax Regs., but, instead, allows taxpayers to use the rules set forth in the 1992 proposed regulations, we believe that this distinction is meaningless under the facts herein. Whereas section 1.469-4T(b)(ii)(B), Temporary Income Tax Regs., contains an explicit rule under which a taxpayer is not considered to participate in a C corporation's activities, petitioner effectively asks the Court to imply the same rule in the 1992 proposed regulations by virtue of the fact that those regulations are silent as to the inapplicability of such a rule. We decline to do so. Accord Sidell v. Commissioner, T.C. Memo. 1999-301; Connor v. Commissioner, T.C. Memo. 1999-185.

We conclude that petitioner may not offset part of the income that he realized on his rental of the office building to the law firm, by the loss that he realized on his rental of the club to the health club. We have considered all arguments in

this case and, to the extent not discussed above, find those arguments to be without merit or irrelevant.  To reflect the foregoing,

<u>An appropriate order will be issued, and decision will be entered for respondent</u>.


Reviewed by the Court.

COHEN, WELLS, RUWE, COLVIN, CHIECHI, FOLEY, VASQUEZ, and THORNTON, <u>JJ</u>., agree with this majority opinion.

BEGHE, J., concurring in part and dissenting in part:  I agree with the majority that section 1.469-2(f)(6), Income Tax Regs. (popularly known as the self-rental rule, and referred to by the majority and hereinafter as the recharacterization rule), as in effect interpreted by the final 1994 activity regulation, section 1.469-4(a), Income Tax Regs., is a valid regulation.  I also agree that petitioners are not entitled to effective date relief from the recharacterization rule under the pre-1988 written binding contract exception of section 1.469-11(c)(1)(ii), Income Tax Regs.  However, I respectfully dissent from the majority's conclusion that petitioners are not entitled, under section 1.469-11(b)(1), Income Tax Regs., to transitional relief from application of the recharacterization rule for 1994 to the net rental income from Mr. Krukowski's C corporation law firm.

The key question is whether shareholders did materially "participate" in the "activities" of their C corporations under the regulatory law applicable to 1994.  The majority conclude that shareholders did so participate, under their "plain reading" of section 469 and the recharacterization rule and their interpretation of the "silent" 1992 proposed regulations that flows therefrom.  I disagree.

I. <u>The Majority's "Plain Reading" of Section 469 and the Recharacterization Rule Is Unprecedented and Incorrect</u>

The majority's plain meaning approach to this case is unprecedented, in several disquieting respects.  To begin with,

neither party argued that the statutory text and the recharacterization rule suffice to answer the question in issue. Instead, the parties' arguments were based on their respective analyses of the applicable provisions of the several successive sets of regulations the Commissioner has issued under section 469, interpreting the terms "participation" or "activity".

More particularly, the parties have agreed that the 1994 final regulations, and the 1992 proposed regulations, are the governing law. As discussed in more detail below, the 1994 final activity regulation clearly provides that shareholders participate in the activities of their C corporations; that regulation generally applies to 1994. See sec. 1.469-11(a)(1), Income Tax Regs. (sec. 1.469-4, Income Tax Regs., applies for taxable years ending after May 10, 1992). However, the 1994 final regulations also contain a transitional rule applicable to the year in issue. Section 1.469-11(b)(1), Income Tax Regs., provides that taxpayers may apply the 1992 proposed regulations to 1994 if they so choose, instead of the 1994 final activity regulation otherwise applicable. In other words, the 1994 final regulations make the 1992 proposed regulations applicable to the year in issue.

For this reason, the parties believed that the crucial issue was whether shareholders participate in C corporation activities under the 1992 proposed regulations, and they made their arguments accordingly.

The majority's "plain reading" of section 469 and the recharacterization rule is also inconsistent with our precedent. In <u>Schwalbach v. Commissioner</u>, 111 T.C. 215 (1998), <u>Sidell v. Commissioner</u>, T.C. Memo. 1999-301, and <u>Connor v. Commissioner</u>, T.C. Memo. 1999-185, we considered the application of the recharacterization rule to C corporation shareholders. None of these opinions relied on the plain meaning of section 469 or of the recharacterization rule. To the contrary, all three opinions treated the 1994 final regulations (and the 1992 proposed regulations made applicable thereby) as the governing law.

Our <u>Schwalbach</u> decision is a striking example of the importance we have attributed to the 1994 final activity regulation in this context. In <u>Schwalbach</u>, respondent applied the recharacterization rule to a C corporation shareholder. The taxpayers' primary argument was that this application was invalid, because: (1) The 1994 final regulation defining "activity" was a prerequisite to the application of the recharacterization rule to a C corporation shareholder; and (2) the recharacterization rule and the 1994 final activity regulation were invalid for failure to comply with the notice and comment procedures of the Administrative Procedure Act, 5 U.S.C. sec. 553(b) and (c) (1994). See <u>Schwalbach v. Commissioner</u>, <u>supra</u> at 219.

In the course of <u>Schwalbach</u>'s detailed analysis of the protracted regulatory process that ultimately gave rise to the

1994 final activity regulation, we never questioned that that regulation was a prerequisite to the application of the recharacterization rule. Indeed, if shareholders clearly participated in C corporation activities under the plain meaning of the statute and the recharacterization rule, as the majority now contend, Schwalbach's analysis and upholding of the 1994 final "activity" regulation would be dictum.[7]

Most importantly, the majority's plain meaning approach is fundamentally inconsistent with the repeated efforts the Commissioner has found it necessary to exert, through issuance of different regulations, simply to interpret and apply the assertedly "plain" language of section 469.

As the majority correctly observe, section 469 defines "material participation" generally. Sec. 469(h). That section, however, neither defines a taxpayer's "activities", nor expressly

---

[7] Of course, in Sidell v. Commissioner, T.C. Memo. 1999-301, and Connor v. Commissioner, T.C. Memo. 1999-185, we did conclude that sec. 1.469-2(f)(6), Income Tax Regs. (the recharacterization rule), could be applied to C corporation shareholders where the regulations promulgated in T.D. 8565, 1994-2 C.B. 81, 59 Fed. Reg. 50485 (Oct. 4, 1994) (the 1994 final regulations), and the regulations promulgated in Notice of Proposed Rulemaking, PS-1-89, 1992-1 C.B. 1219, 57 Fed. Reg. 20802 (May 15, 1992) (the 1992 proposed regulations), applied. I believe those decisions should no longer be followed. As I explain in the text below, the 1992 proposed regulations, properly interpreted, prevent shareholder participation in C corporation activities.

In any event, the majority rely little on Sidell and Connor for their conclusion; perhaps this is because the majority's view of the governing law is so fundamentally different from the views expressed in those opinions.

states whether a taxpayer can "participate" in the activities of entities he owns. Nor does the recharacterization rule, which uses these terms, provide a definition of either of them.

If I were writing on a clean slate, before the Commissioner had issued any relevant regulations defining "material participation" or "activity", I might conclude that a shareholder could participate in the activities of his C corporations, under a plausible interpretation of the statute.[8] However, the slate was far from clean during the year in issue. As discussed in more detail below, on at least four separate occasions--in 1988, 1989, 1992, and 1994--the Commissioner issued temporary, proposed, or final regulations interpreting "activity" or "participation" for purposes of section 469.

Of course, the mere existence of these detailed and often contradictory versions of the regulations is compelling evidence that the meaning of section 469 is anything but plain.[9] Above

---

[8] I'm not sure, however, that even in the absence of regulations I would agree with the majority that attributing C corporation activities to the shareholder is a foregone conclusion under either the statute or the recharacterization rule. Both the tax common-law rule of Moline Properties, Inc. v. Commissioner, 319 U.S. 436 (1943), and the necessity of statutory stock ownership attribution rules in other areas, e.g., secs. 267, 318, and 544, would give me pause, even if they wouldn't bar this approach.

[9] One of the section 469 regulations--the temporary "activity" regulation promulgated in 1989--alone occupied over 20 pages of the Federal Register. See sec. 1.469-4T, Temporary Income Tax Regs., 54 Fed. Reg. 20527, 20542-20565 (May 12, 1989). As described in the text infra p. 34, the Commissioner allowed
(continued...)

all, however, the content of these successive regulations demonstrates that the majority's "plain meaning" interpretation of the statute and the recharacterization rule is incorrect.

The majority conclude that shareholders participate in C corporation activities under the plain meaning of section 469 and the recharacterization rule.  <u>The fatal flaw of this conclusion is that the Commissioner reached the opposite conclusion in the section 469 regulations--not once but twice</u>.

In 1988 and 1989, the Commissioner was faced with the same statutory language.  And yet, during those years the Commissioner interpreted that language--in temporary regulations having the force of law--to conclude that <u>shareholders did not participate in C corporation activities</u>.  See the discussion of the 1988 and 1989 temporary regulations <u>infra</u> pp. 30-34.

The majority do not argue (or even dare to suggest) that the express nonparticipation (or nonattribution) rules set forth in the temporary regulations were invalid interpretations of the statute.  Moreover, none of the parties litigating (or courts considering) the application of the recharacterization rule to C corporation shareholders has ever argued or concluded that the temporary regulations were invalid in this respect.  The

---

[9](...continued)
this regulation to "sunset" under sec. 7805(e), partly as a result of public criticism that it was overly long and complex, burdensome for small taxpayers, and mechanically inflexible.  See <u>Schwalbach v. Commissioner</u>, 111 T.C. 215, 224 (1998).

Commissioner's inclusion of express nonattribution rules in two sets of temporary regulations therefore completely refutes the majority's conclusion that shareholders participate in C corporation activities under the plain language of section 469 and the recharacterization rule.

II.  The Silence of the 1992 Proposed Regulations Is Not Dispositive

The majority correctly note that the Commissioner allowed the relevant portions of the temporary regulations to "sunset" in 1992.  See infra p. 34.  At the same time, the Commissioner promulgated the 1992 proposed regulations, which apply to the year in issue.  See id.

Unlike the temporary regulations, the 1992 proposed regulations say nothing about shareholder participation in C corporation activities.  The majority conclude, because the 1992 proposed regulations do not expressly preclude such participation, that shareholders participate in C corporation activities even when the proposed regulations apply.  Once again, I disagree.

The majority's interpretation of the "silent" 1992 proposed regulations rests on their conclusion that shareholders participate in C corporation activities under the plain meaning of the statute and the recharacterization rule.  As explained above, the majority's plain reading is incorrect; their interpretation of the 1992 proposed regulations is therefore also

incorrect.  The silence of the 1992 proposed regulations simply does not require (or as explained below, even permit) us to reach the majority's result.

> III.  <u>The Silence of the 1992 Proposed Regulations Must Be Interpreted in Light of the Prior and Subsequent Regulations</u>

In essence, the majority view section 469 and the recharacterization rule as self-executing and as mandating a rule of shareholder participation in C corporation activities unless another rule expressly bars such participation.  <u>Consistent with this view, the majority conclude that the silent 1992 proposed regulations cannot constitute the necessary bar</u>.

My view is different.  I see section 469--particularly as implemented by the recharacterization rule--as an ambiguous statute, which the Commissioner reasonably interpreted, in temporary regulations having the force of law--not once but twice--as precluding shareholder participation in C corporation activities.

Of course, the Commissioner later adopted a contrary interpretation.  <u>However, the Commissioner did not publicly announce this contrary interpretation until 1994, when he issued the 1994 final regulations.  This announcement came more than 6 years after the 1988 temporary regulations, and almost at the end of 1994, the taxable year in issue</u>.  See <u>Schwalbach v. Commissioner</u>, 111 T.C. at 226, where we stated that "up until the [1994] final regulations, the Commissioner had not publicly taken

the position that an individual's activities could include activities conducted through a C corporation."

I agree that the Commissioner is entitled to change his mind; we so decided in Schwalbach. However, under the circumstances of this case, where the Commissioner had issued two sets of temporary regulations taking a position favorable to taxpayers (and petitioners), the standards of fairness developed by this Court (discussed in more detail below) require that the Commissioner publicly announce his change of position, before the new position can take effect. See Georgia Fed. Bank v. Commissioner, 98 T.C. 105, 110 (1992), where we stated that an agency that changes its position must acknowledge that its interpretation has shifted and must supply a persuasively reasoned explanation for the change. See also Gottesman & Co. v. Commissioner, 77 T.C. 1149 (1981), and Corn Belt Hatcheries of Arkansas, Inc. v. Commissioner, 52 T.C. 636 (1969) (discussed infra pp. 48-50), where we decided that taxpayers were entitled to rely on withdrawn or unclarified guidance from the Commissioner, until the Commissioner publicly announced his new or clarified position.

Against this background, the proper interpretation of the "silent" 1992 proposed regulations becomes vitally important. Although the Commissioner allowed the relevant portions of the 1988 and 1989 temporary regulations to "sunset" in 1992 and replaced them with the 1992 proposed regulations, neither these

actions, nor the silent proposed regulations themselves, constituted the necessary public announcement of the Commissioner's change of position from the temporary regulations.

Prior to the issuance of the 1994 final regulations, taxpayers could not know (or, as explained below, even infer) that the Commissioner had changed his interpretation of section 469 and the recharacterization rule. Although this delay did not render the 1994 final regulations invalid, the standards of fairness developed by this Court require that we interpret the silence of the 1992 proposed regulations as preserving the interpretation of the statute previously promulgated in both sets of temporary regulations. Once that silence is so interpreted, the transitional rule of the 1994 final regulations can perform its relief-providing function, and protect taxpayers from the unannounced and unanticipated change those regulations made to the Commissioner's prior interpretations of the law.

In reaching this conclusion, I'm not suggesting that the Commissioner lacked the power to prescribe a final regulation that would have applied the new activity definition retroactively.[10] As we concluded in <u>Schwalbach</u>, the

---

[10] See sec. 7805(b) (the Secretary may prescribe the extent, if any, to which a regulation shall be applied without retroactive effect); <u>Automobile Club of Michigan v. Commissioner</u>, 353 U.S. 180, 184 (1957) (Commissioner may correct any regulation retroactively, but also has discretion to limit retroactivity to avoid inequitable results); cf. sec. 7805(b) as in effect for regulations relating to statutory provisions enacted after July
(continued...)

Commissioner's actions had at least alerted taxpayers to the possibility that the definition of activity was under reconsideration.  What we should decide in the case at hand, however, is that by promulgating the transitional rule of the 1994 final regulations, the Commissioner wisely chose to apply the new activity definition prospectively, unless the taxpayer benefited otherwise.

In summary, the majority's plain reading of section 469 and the recharacterization rule is an inadequate analysis of, and a woefully inadequate response to, the situation in which petitioners (and other similarly situated taxpayers) found themselves during the year in issue.  To understand that situation fully--and to interpret the silent 1992 proposed regulations properly--it's unfortunately necessary to describe the long and tortuous history of the section 469 regulations (and the parties' arguments based thereon) in more detail; to that task I now turn.

---

[10](...continued)
29, 1996.  Of course, the Commissioner's unexplained reversal of position from the regulations promulgated in T.D. 8175, 1988-1 C.B. 191, 53 Fed. Reg. 5686 (Feb. 25, 1988) (the 1988 temporary regulations), and in T.D. 8253, 1989-1 C.B. 121, 54 Fed. Reg. 20527 (May 12, 1989) (the 1989 temporary regulations), would be relevant in any judicial review of the 1994 final regulations, if the Commissioner had decided to apply those regulations retroactively.  See Georgia Fed. Bank v. Commissioner, 98 T.C. 105 (1992).

IV.  Development of the Regulations Over Time

The recharacterization rule recharacterizes rental income from property "rented for use in a trade or business activity * * * in which the taxpayer materially participates * * * for the taxable year".  Sec. 1.469-2(f)(6)(i), Income Tax Regs.  During 1994, Mr. Krukowski rented the office building to the law firm.  Therefore, the recharacterization rule applies to petitioners' income from the office building for that year only if Mr. Krukowski materially "participated" in a trade or business "activity" of the law firm during that year.

Because the law firm is a C corporation, we're required to decide whether a shareholder could participate in a trade or business activity of his C corporation under the law applicable to 1994.  In 1988, 1989, 1992, and 1994, the Commissioner issued temporary, proposed, or final regulations defining "activity" or "material participation" for purposes of section 469.  We must therefore trace these regulations' successive answers to that question.

A.  The 1988 Temporary Regulations

In 1988, the Commissioner issued the first section 469 regulations.  See T.D. 8175, 1988-1 C.B. 191, 53 Fed. Reg. 5686 (Feb. 25, 1988) (the 1988 temporary regulations).  The 1988 temporary regulations contained the first version of the recharacterization rule (see sec. 1.469-2T(f)(6), Temporary Income Tax Regs., 53 Fed. Reg. 5686, 5723 (Feb. 25, 1988)).  That

rule, like the current rule, applied where property was rented to an "activity" in which the taxpayer materially "participates".

The 1988 temporary regulations didn't define "activity". See sec. 1.469-4T, Temporary Income Tax Regs., 53 Fed. Reg. 5686, 5725 (Feb. 25, 1988), which stated in full: "Definition of activity (temporary). [Reserved]". They did, however, contain a regulation entitled "Material participation", which defined both "participation" and the kind of participation deemed to be material. Sec. 1.469-5T, Temporary Income Tax Regs., 53 Fed. Reg. 5686, 5725-5728 (Feb. 25, 1988). The participation definition in section 1.469-5T of the 1988 temporary regulations provided:

> (f) Participation--(1) In general. Except as otherwise provided in this paragraph (f), any work done by an individual (without regard to the capacity in which the individual does such work) in connection with an activity in which the individual owns (directly or indirectly, other than through a C corporation) an interest at the time the work is done shall be treated for purposes of this section as participation of such individual in the activity. [Sec. 1.469-5T(f)(1), Temporary Income Tax Regs., 53 Fed. Reg. 5686, 5726 (Feb. 25, 1988); emphasis added.]

The second parenthetical of this 1988 definition clearly provided that an individual shareholder did not participate (and thus could not materially participate) in the activities of his C corporations.[11] As a result, under the 1988 temporary

---

[11] Unless the shareholder also owned a passthrough interest in the C corporation's activity, through which he could be considered to participate. See sec. 1.469-5T(k), Examples (1)
(continued...)

regulations the recharacterization rule could not apply to income received by a C corporation's shareholder/lessor, notwithstanding the absence of an "activity" definition in those regulations.

B.  The 1989 Temporary Regulations

In 1989, the Commissioner issued T.D. 8253, 1989-1 C.B. 121, 54 Fed. Reg. 20527 (May 12, 1989) (the 1989 temporary regulations).  The 1989 temporary regulations amended certain provisions of the 1988 temporary regulations; they also contained the first regulation defining "activity" for purposes of section 469, section 1.469-4T, Temporary Income Tax Regs., 54 Fed. Reg. 20527, 20542 (May 12, 1989).  See T.D. 8253, 1989-1 C.B. 121, supra at "Summary".

The 1989 temporary regulations amended the participation definition contained in the 1988 temporary regulations by deleting the parenthetical phrase "(directly or indirectly, other than through a C corporation)".  Sec. 1.469-5T, Temporary Income Tax Regs., 54 Fed. Reg. 20527, 20565 (May 12, 1989).[12]  As a result, the material participation definition in the 1989

---

[11](...continued)
and (2), 53 Fed. Reg. 5686, 5727 (Feb. 25, 1988).

[12] The majority opinion refers to the participation definition of the 1988 temporary regulations, as amended by the 1989 temporary regulations, as the "amended 1988 temporary regulations".  I prefer to describe the Commissioner's simultaneous 1989 definitions of both "participation" and "activity" as the 1989 temporary regulations; after all, it was those definitions taken together that established the law applicable to 1989.

temporary regulations no longer expressly stated that a shareholder could not participate in the activities of his C corporations.

At first blush, one might think that this elimination of restrictive language--and the resulting silence about whether individuals could participate in their indirectly owned activities--might mean that individuals could participate in the activities of all their entities, including C corporations. However, this was not the case. The new definition of "activity" contained in section 1.469-4T of the 1989 temporary regulations expressly provided that a shareholder did not participate in the activities of his C corporations.[13]  As a result of this new

_____

[13] New sec. 1.469-4T of the 1989 temporary regulations defined activity for purposes of the passive loss rules.  See sec. 1.469-4T, Temporary Income Tax Regs., 54 Fed. Reg. 20527, 20542 (May 12, 1989).  Sec. 1.469-4T(b)(2)(ii)(B) of those regulations provided that for purposes of section 469 and the regulations thereunder "a taxpayer's activities do not include operations that a taxpayer conducts through one or more entities (other than passthrough entities)."  Id. at 20543.  Sec. 1.469-4T(b)(2)(i) in turn defined "passthrough entity"; that definition did not include C corporations.  Id. at 20543.

A shareholder's inability to participate in the activities of his C corporations under the cited provisions was made clear by the example accompanying section 1.469-4T(b)(2) of the 1989 temporary regulations.  In the facts of that example, taxpayer A owned stock of closely held corporation X.  The example stated:

  X is a C corporation and therefore is not a passthrough entity.  Thus, for purposes of section 469 and the regulations thereunder, A's activities do not include the operations of X's real estate development business. Accordingly, A's participation in X's business is not participation in an activity of A, and is not taken

                                        (continued...)

activity definition, it was clear that a shareholder did not participate in C corporation activities under the 1989 temporary regulations--notwithstanding the silence on this issue in the material participation definition itself.

### C.   The 1992 Proposed Regulations

In 1992, the Commissioner adopted the participation definition of the 1989 temporary regulations substantially unchanged, as final regulation section 1.469-5(f)(1), Income Tax Regs.  See T.D. 8417, 1992-1 C.B. 173, 57 Fed. Reg. 20747 (May 15, 1992).[14]  At the same time, the Commissioner allowed the activity definition of the 1989 temporary regulations to "sunset" under section 7805(e).  The Commissioner replaced that definition with a new proposed activity regulation, section 1.469-4, Proposed Income Tax Regs.  See Notice of Proposed Rulemaking, PS-1-89, 1992-1 C.B. 1219, 57 Fed. Reg. 20802 (May 15, 1992) (the 1992 proposed regulations).  Unlike the 1989 temporary regulations, the 1992 proposed regulations didn't contain a general purpose definition of a taxpayer's activities.  Instead, the 1992 proposed regulations were silent on whether a shareholder could participate in the activities of his C

---

[13](...continued)
into account in determining whether A materially participates (within the meaning of 1.469-5T) * * * in any activity.  [Sec. 1.469-4T(b)(2), Temporary Income Tax Regs., 54 Fed. Reg. 20543-20544 (May 12, 1989).]

[14] The majority opinion refers to this definition as the 1992 final regulations.

corporations.  The effect of this silence on the application of the recharacterization rule is what's in issue in this case.

D.  <u>The 1994 Final Regulations</u>

In 1994, the Commissioner issued T.D. 8565, 1994-2 C.B. 81, 59 Fed. Reg. 50485 (Oct. 4, 1994) (the 1994 final regulations). The 1994 final regulations didn't change the participation definition adopted at the time of the 1992 proposed regulations. However, the 1994 final regulations substantially revised the 1992 proposed regulations' activity definition, by adding the following statement to the "scope and purpose" provision:  "A taxpayer's activities include those conducted through C corporations that are subject to section 469, S corporations, and partnerships."  Sec. 1.469-4(a), Income Tax Regs.  As a result of this change, it was clear that a shareholder would materially participate in the activities of his C corporations under the 1994 final regulations--even though the participation definition itself was not affected.

The following table summarizes the development over time of the activity and material participation definitions in the section 469 regulations, as described above.  It also notes whether, as a result of those definitions, a shareholder could participate in the activities of his C corporations.

| Year/event | Provision re shareholder's participation in his C corporation's activities | | Overall effect |
| | "Activity" regulation | "Material participation" regulation | |
|---|---|---|---|
| 1988 temporary regulations (T.D. 8175) | Silent (no activity regulation) | Parenthetical expressly provides shareholder does not participate in C corporation activities | Shareholder does not participate in C corporation activities |
| 1989 temporary regulations (T.D. 8253) | Definition and example expressly provide shareholder does not participate in C corporation activities | Silent (parenthetical removed) | Shareholder does not participate in C corporation activities |
| 1992 proposed regulations (PS-1-89) | Silent (no definition or example) | Silent (same as above) | ??? (at issue in the case at hand) |
| 1994 final regulations (T.D. 8565) | Expressly provides that taxpayer's activities include those conducted through C corporations subject to sec. 469 | Silent (same as above) | Shareholder participates in activities of C corporations subject to sec. 469 |

V.  The 1992 Proposed Regulations Control This Case

As the above discussion makes clear, the 1988 and 1989

temporary regulations expressly provided that shareholders did

not participate in C corporation activities; the 1994 final regulations expressly provide that shareholders do so participate. The 1992 proposed regulations said nothing about this issue.

The 1994 final regulations generally apply to 1994. See sec. 1.469-11(a)(1), Income Tax Regs. (sec. 1.469-4, Income Tax Regs., applies for taxable years ending after May 10, 1992). However, taxpayers may choose to apply the 1992 proposed regulations, rather than the 1994 final regulations, to determine tax liability for years ending after May 10, 1992 and beginning before October 4, 1994. See sec. 1.469-11(b)(1), Income Tax Regs.

The parties agree that the 1992 proposed regulations apply to this case.

VI.  We Need Not Infer that Shareholders Participate in
     C Corporation Activities Under the 1992 Proposed
     Regulations

The majority conclude (as respondent argued) that the silence of the 1992 proposed regulations must be interpreted as allowing shareholder participation in C corporation activities. According to the majority (and respondent), because the 1992 proposed regulations do not contain the express nonparticipation rule of the temporary regulations, it must be inferred that the Commissioner did not intend to continue that rule in the 1992 proposed regulations. The majority conclude that it must be inferred further that shareholders participate in C corporation

activities where the 1992 proposed regulations apply.  I
disagree.[15]

A.   The Proposed Regulations' Silence Is Ambiguous

The long and tortuous history of the section 469 regulations
proves that we need not infer a shareholder participation rule
from the silence of the 1992 proposed regulations.  To the
contrary, the history shows that silence was ambiguous.

The recharacterization rule employs the terms "activity"
and "material participation".  As the table, supra p. 36, clearly
shows, under both the 1988 and 1989 temporary regulations, the
definition of one of these key terms didn't discuss a
shareholder's participation in C corporation activities.
Nevertheless, under both sets of temporary regulations, a
shareholder clearly did not participate in C corporation
activities, because one or the other of the two key terms was
interpreted as precluding attribution of or participation in such
activities.

---

[15] Our memorandum opinion in Sidell v. Commissioner, T.C.
Memo. 1999-301, made a similar inference in support of its
conclusion that shareholders participate in corporate activities
under the 1992 proposed regulations.  Although Sidell v.
Commissioner, 78 T.C.M. (CCH) 53,537 at 430, 1999 T.C.M. (RIA)
par. 99,301 at 99-1929, stated that "Simply put, the proposed
regulations' silence means nothing, not something", Sidell
nevertheless concluded that from this silence "it is inferable"
that the Commissioner didn't intend, in the 1992 proposed
regulations, to adhere to the position of the temporary
regulations.

Under the 1994 final regulations, one of the key definitions--regarding material participation--still does not address the question of C corporation shareholder participation. Yet, as a result of the new activity definition contained in those regulations, a shareholder clearly participates in C corporation activities under the regulations as a whole.

The result of all this is that in 1988 and 1989, regulatory silence with respect to one of the key terms employed by the recharacterization rule meant that a shareholder did not participate in C corporation activities. By contrast, in 1994, such regulatory silence means that the shareholder does participate in those activities. Under these circumstances, it is difficult to infer either an intent to repeal a nonparticipation rule, or an intent to prescribe a participation rule, from the "silence" of the 1992 proposed regulations. More tellingly, it would have been far more difficult for petitioners to divine either of these results from that silence during 1994, the year in issue; the 1994 final regulations were not promulgated until October of that year. See supra p. 35.

B. The Canons of Construction Do Not Mandate A
   Participation Interpretation

The majority attempt to support their interpretation of the 1992 proposed regulations by reference to a canon of statutory construction. However, canons of construction simply do not require us to reach the majority's result.

The majority note that material contained in earlier-enacted legislation, but omitted in subsequently enacted legislation, is deemed to be repealed by the subsequent enactment. The majority employ this canon (and apply it to regulations) to support their conclusion that the 1992 proposed regulations' failure to restate one or the other of the express nonparticipation rules contained in the 1988 and 1989 temporary regulations means that the 1992 proposed regulations repealed that rule.

Although the majority's canon may be helpful at times, this case should not (and need not) be decided by a canon of construction. First, the canon cited by the majority is far from an absolute rule. It may be disregarded where the lawmaker's intent is found to be otherwise. See Singer, Sutherland Statutory Construction, sec. 23.32 at 283 and sec. 23.12 at 363 (5th ed. 1993).

Second, and more importantly, the canons of construction usually cut both ways, see Llewellyn, The Common Law Tradition: Deciding Appeals 521-535 (1960), even when they're not just wrong. See Posner, Statutory Interpretation--in the Courtroom and in the Classroom, 50 U. of Chi. L. Rev. 800, 806 (1983).[16]

_____

[16] The temporary regulations contain an excellent example of a situation in which the majority's canon would produce the wrong answer. The 1988 temporary regulations' participation definition contained language expressly preventing shareholder participation in C corporation activities. The 1989 temporary regulations

(continued...)

For example, another canon of construction, applied in
<u>Smietanka v. First Trust & Sav. Bank</u>, 257 U.S. 602, 607 (1922),
on the effect of material <u>added</u> on reenactment, not material
<u>omitted</u>, cuts against the majority's argument.  In <u>First Trust &
Sav. Bank</u>, the Supreme Court treated the addition of an express
rule, by a later enactment, as proof the rule was not included in
the analogous provisions of an earlier statute.

The 1994 final regulations expressly state that a
shareholder's activities include those conducted through C
corporations subject to section 469.  The silent 1992 proposed
regulations contained no such participation/attribution rule.
Therefore, the <u>First Trust & Sav. Bank</u> canon of construction
suggests that shareholders did not participate in C corporation
activities under the 1992 proposed regulations.  As the Supreme
Court concluded in <u>First Trust & Sav. Bank</u>, where a provision has
been added to a later act, a court cannot supply the omission in
the earlier act.[17]

---

[16](...continued)
deleted this language.  Applying the majority's canon, one would
conclude the Commissioner intended shareholders to participate in
C corporation activities under the later regulation.  However,
this was not the case, as the activity definition of the 1989
temporary regulations clearly shows.  See <u>supra</u> pp. 32-34.

[17] One other point:  the cases cited by the majority to
support their canons of construction argument concern situations
where an express rule was clearly required to sustain a party's
position.  For example, <u>Independent Ins. Agents of Am., Inc. v.
Clarke</u>, 955 F.2d 731 (D.C. Cir. 1992), revd. on other grounds sub
nom. <u>United States Natl. Bank v. Independent Ins. Agents of Am.</u>,
(continued...)

C.  The Express Participation Rule of the 1994 Final
    Regulations Did Not "Clarify" the 1992 Proposed
    Regulations

To support the position that shareholders participate in C

corporation activities under the 1992 proposed regulations,

respondent additionally argued that the express participation

rule of the 1994 final regulations simply "clarified" the 1992

proposed regulations.  This is also incorrect.

The 1994 final regulations included the following sentence

dealing with the "scope and purpose" of the activity definition:

"A taxpayer's activities include those conducted through C

corporations that are subject to section 469, S corporations, and

partnerships."  Sec. 1.469-4(a), Income Tax Regs. (the express

participation (or attribution) rule).  It is true that the

preamble to the 1994 final regulations stated that this language

_____

[17](...continued)
Inc., 508 U.S. 439 (1993), concerned a national bank's ability to
sell insurance.  In the Court of Appeals' view, section 24 of the
National Bank Act, 12 U.S.C. sec. 24 (1988), limited banks'
activities to those expressly authorized by law.  Starting from
this premise, it of course followed, after Congress omitted the
section of the banking laws authorizing banks to sell insurance,
that banks no longer had the power to do so.

The majority assert that an express nonattribution rule is
necessary to prevent shareholder participation in C corporation
activities.  As made clear in the text, this is incorrect.  The
Commissioner's interpretations of the statute in both sets of
temporary regulations, the Commissioner's inclusion of an express
participation rule in the 1994 final regulations, and our
decision in Schwalbach v. Commissioner, 111 T.C. 215 (1998),
treating the 1994 final regulations as necessary, all suggest
that shareholders do not participate in C corporation activities,
under the plain meaning of section 469.

was a clarification.  See T.D. 8565, 1994-2 C.B. 81, 59 Fed. Reg. 50485 (Oct. 4, 1994), at "Supplementary Information:  Explanation of Provisions; II. Public Comments".  Under the circumstances of this case, however, there is no reason to give the Commissioner's retrospective rationalization contained in the preamble to the 1994 final regulations any more interpretative weight than respondent's litigating position.

Of course, a preamble may be used as an aid in interpreting the regulation it accompanies.  See Armco, Inc. v. Commissioner, 87 T.C. 865, 868 (1986).  But the case at hand concerns the meaning of the 1992 proposed regulations, not the meaning of the 1994 final regulations.  The 1994 preamble was not a contemporaneous interpretation of the 1992 regulations in issue. As a retrospective rationalization, it's entitled to little or no interpretative weight.  See id. at 868, where we stated:

> The proper interpretation of a regulation as a matter of law is a responsibility that ultimately rests with the courts.  In exercising its judicial function, the court may be aided by the views of the drafters on the intended meaning of the language, but to be accorded any weight, those views cannot be post hoc * * * .

More importantly, the preamble's statement that the language added to the 1992 proposed regulations' activity definition by the 1994 final regulations was only a clarification simply does not withstand scrutiny.  According to the preamble, the new language clarified a "grouping" rule contained in the 1992 proposed regulations, by explaining that a taxpayer could group

activities conducted through C corporations with other activities.  See 59 Fed. Reg. 50485, 50486 (Oct. 4, 1994).  The 1992 proposed regulations' grouping rule (contained in section 1.469-4(j) of the 1992 proposed regulations, 57 Fed. Reg. 20802, 20805 (May 15, 1992)) had provided as follows:

> (j) <u>Activities conducted through partnerships or S corporations</u>.  A partnership or S corporation must group its activities under the rules of this section. Once a partnership or S corporation determines its activities, a partner or shareholder groups those activities with activities conducted directly by the partner or shareholder or with activities conducted through other partnerships or S corporations in accordance with the rules of this section.

As the above-quoted passage makes clear, the grouping rule of the 1992 proposed regulations provided that a taxpayer could group activities conducted through passthrough entities with activities conducted directly.  Notwithstanding the Commissioner's claim in the preamble, I fail to understand how a rule entitled "Activities conducted through partnerships or S corporations", and which refers explicitly several times only to such passthrough entities, could be "clarified" to provide that a taxpayer may group activities conducted through nonpassthrough entities as well, such as "C corporations that are subject to section 469".

Our decision in <u>Schwalbach v. Commissioner</u>, 111 T.C. 215 (1998), also establishes that the express attribution rule of the 1994 final regulations was not simply a "clarification" of the 1992 proposed regulations.  Although our memorandum opinion in

Connor v. Commissioner, T.C. Memo. 1999-185, suggested Schwalbach had concluded that the 1994 final regulations clarified the proposed regulations, what we actually said in Schwalbach was that the preamble to the final regulations itself asserted that the inclusion of an attribution rule in the final regulations was a clarification; we didn't so conclude ourselves. To the contrary, in Schwalbach v. Commissioner, supra at 221-226, we described the language added to the 1994 final regulations as a "change" from the 1992 proposed regulations, as a "new position", and as a "complete reversal" from the 1989 temporary regulations. We also stated that "the change in language from the proposed regulations was substantial; up until the final regulations, the Commissioner had not publicly taken the position that an individual's activities could include activities conducted through a C corporation." Id. at 226.

VII. Fairness Demands We Interpret the Silence of the 1992 Proposed Regulations as Continuing the Nonparticipation Rule of the Temporary Regulations

Respondent and the majority assert that the silence of the 1992 proposed regulations must be interpreted as repealing the nonparticipation rule of the temporary regulations and as prescribing an express participation rule instead. For the reasons just set forth, I disagree. Placing the silence of the 1992 proposed regulations in its proper context, it's difficult to infer from such silence either an intent to repeal a nonparticipation rule, or an intent to prescribe a participation

rule.  With respect to the issue in the case at hand, the recharacterization rule and the 1992 proposed regulations are ambiguous.

Nevertheless, setting aside for the moment any inferences that may be drawn from the silence (or other ambiguity) of the 1992 proposed regulations, three aspects of those regulations are crystal clear.  First, the 1992 proposed regulations do not expressly provide that a shareholder participates in C corporation activities.  Second, the 1992 proposed regulations do not expressly disavow the rule of nonattribution that had been set forth in the 1988 and 1989 temporary regulations.  Third, the 1992 proposed regulations neither state that the Commissioner was changing his position on shareholder participation in C corporation activities, nor explain why such a change was being made.  For all these reasons, the standards of fairness developed by this Court require us to interpret the ambiguity of the 1992 proposed regulations as maintaining the nonattribution interpretation of the statute and the recharacterization rule formerly contained in the temporary regulations.

As an example of these standards of fairness, we noted in Georgia Fed. Bank v. Commissioner, 98 T.C. at 110, that sharp changes of agency course constitute danger signals to which a reviewing court must be alert; we also stated that an agency that changes its position must acknowledge that its interpretation has

shifted, and must supply a persuasively reasoned explanation for the change.[18]

It is in this context that (contrary to the statement in Sidell v. Commissioner, T.C. Memo. 1999-301) the silence of the 1992 proposed regulations means something, not nothing. The silent proposed regulations could not (and did not) serve as the required public announcement of the Commissioner's change of position from the temporary regulations, or as the required explanation of the reasons for that change. It is uncontested that the first public announcement by the Commissioner of his complete reversal of position was contained in the 1994 final regulations, which were not published in the Federal Register until October 4, 1994. See Schwalbach v. Commissioner, supra at 226; 59 Fed. Reg. 50485 (Oct. 4, 1994) (promulgation of 1994 final regulations).

I agree with our conclusion in Schwalbach v. Commissioner, supra, that the silence of the 1992 proposed regulations alerted taxpayers to the possibility that the Commissioner was considering changing the nonattribution rule contained in the

---

[18] In Georgia Fed. Bank v. Commissioner, 98 T.C. 105, 109-110 (1992), we also observed that if a regulation repudiates an earlier interpretation, the manner in which it evolved merits inquiry, and the more recent interpretation may be accorded less deference than a consistently maintained position. We further noted that an agency's action must be upheld, if at all, on the basis articulated by the agency at the time of the rule making; post hoc rationalizations cannot be offered to buttress an agency's action.

1988 and 1989 temporary regulations; the 1994 final regulations, although different from the temporary and proposed regulations, were therefore valid.  However, taxpayers could not have concluded, on the basis of the silence of the 1992 proposed regulations, that the Commissioner <u>had in fact changed that rule</u>.

Our cases interpreting another large and detailed set of legislative regulations--the consolidated return regulations--provide another example of how the standards of fairness instruct us to interpret the Commissioner's silence in the case at hand. We have held that the Commissioner is bound by the consequences flowing from the silence (or the express terms) of the consolidated return regulations, even when those consequences are arguably at odds with larger tax principles or the statute as a whole.  See <u>Woods Inv. Co. v. Commissioner</u>, 85 T.C. 274 (1985) (literal application of consolidated return regulations binding, even though result was allegedly a double deduction for the taxpayer); <u>Gottesman & Co. v. Commissioner</u>, 77 T.C. 1149 (1981) (refusal to "fill in the gaps" regarding imposition of accumulated earnings tax on corporations filing consolidated returns).

Our opinion in <u>Gottesman & Co. v. Commissioner</u>, <u>supra</u>, is particularly instructive.  <u>Gottesman & Co.</u> also considered <u>the effect of the Commissioner's silence, following the withdrawal of regulations favorable to the taxpayer</u>.  In <u>Gottesman & Co.</u>, we considered whether the taxpayer (the common parent of an

affiliated group) was required to compute "accumulated taxable
income" (for purposes of the accumulated earnings tax, section
531) on a consolidated basis as the Commissioner contended, or on
a separate-company basis as the taxpayer contended.  Under one
set of proposed regulations, certain taxpayers (including the
taxpayer in Gottesman & Co.) would have computed accumulated
taxable income on a separate company basis.  Those proposed
regulations were withdrawn prior to the years in issue in
Gottesman & Co.; proposed regulations reaching the opposite
result were promulgated after those years.  In holding for the
taxpayer, we concluded, against this background, that the
Commissioner's silence during the years in issue had failed to
provide sufficient guidance to the taxpayer:

> Though the 1968 proposed regulations were withdrawn in
> 1971, before the years involved in this case, we can
> readily understand petitioner's confusion as to
> respondent's true position * * *. * * *
>
> We cannot fault petitioner for not knowing what
> the law was in this area when the Commissioner, charged
> by Congress to announce the law (sec. 1502), never
> decided what it was himself. * * *
>
> Thus, we find that the Commissioner's regulations
> regarding the manner in which the accumulated earnings
> tax was to be imposed on corporations making
> consolidated returns were ambiguous during the years at
> issue.  This ambiguity was of the Commissioner's
> making, and, as such, must be held against him.  * * *
> We think that under these circumstances the failure of
> petitioner to comply with respondent's post hoc view of
> the regulations is an insufficient ground on which to
> impose the accumulated earnings tax, and we hold for
> petitioner on the issues herein presented.[4]

[4] See also <u>Corn Belt Hatcheries of Arkansas, Inc. v.</u> <u>Commissioner</u>, 52 T.C. 636 (1969).

[<u>Gottesman & Co. v. Commissioner</u>, 77 T.C. at 1157-1158.]

Our opinion in <u>Corn Belt Hatcheries of Arkansas, Inc. v.</u> <u>Commissioner</u>, 52 T.C. 636 (1969) (cited in <u>Gottesman & Co.</u> at 1158 n.4), further supports interpreting any ambiguity in the 1992 proposed regulations in petitioners' favor; it also addresses and downplays the role of the Commissioner's subsequently asserted "clarification" in that interpretation.  In <u>Corn Belt Hatcheries of Arkansas, Inc.</u>, the taxpayer (a common parent corporation) arguably would have been permitted to file a separate return under the language of a revenue ruling.  However, the taxpayer clearly would not have been able to do so under a subsequently published "clarification" of that language in another revenue ruling.  In holding for the taxpayer we wrote:

> Petitioner interprets * * * [the first revenue ruling] to permit what its words seem to say * * *.  We consider this interpretation a plausible one and we are not disposed to reject it by importing into the ruling the subsidiary qualification asserted by respondent. Taxpayers are already burdened with an incredibly long and complicated tax law.  We see no reason to add to this burden by requiring them anticipatorily to interpret ambiguities in respondent's rulings to conform to his subsequent clarifications, particularly in an area, such as consolidated returns, where Congress has placed such reliance on respondent's expertise. * * * [<u>Corn Belt Hatcheries of Arkansas,</u> <u>Inc. v. Commissioner</u>, <u>supra</u> at 639-640.][19]

[19] Sec. 1.469-1T(g)(3)(iii), Temporary Income Tax Regs., 53 Fed. Reg. 5686, 5707-5708 (Feb. 25, 1988), further supports the interpretation that a shareholder <u>did not</u> participate in C

(continued...)

## Conclusion

Notwithstanding the majority's belated resort to "plain meaning", section 469 is a technical and complicated statute. The regulations promulgated under that section have been detailed and voluminous; they have also changed significantly over time.

---

[19](...continued)
corporation activities under the 1992 proposed regulations. Personal service corporations and closely held C corporations are themselves subject to the passive loss rules. See sec. 469(a)(2)(B) and (C). Sec. 1.469-1T(g)(3), Temporary Income Tax Regs., 53 Fed. Reg. 5707-5708 (Feb. 25, 1988) determines when such corporations will be considered to participate in their own activities. Sec. 1.469-1T(g)(3)(iii), Temporary Income Tax Regs., supra, provides that for this purpose, the general participation definition of sec. 1.469-5T, Temporary Income Tax Regs., shall apply, except that individuals shall be treated as holding an interest in all corporate activities.

This special participation definition was first promulgated as part of the 1988 temporary regulations (see sec. 1.469-1T(g)(3)(iii), Temporary Income Tax Regs., supra. It was an exception to the general participation definition of those 1988 temporary regulations, which expressly provided that a shareholder did not participate in C corporation activities. See supra pp. 30-32.

The Commissioner did not amend or remove the special participation definition of sec. 1.469-1T(g)(3)(iii), Temporary Income Tax Regs., supra, when he promulgated the 1992 proposed regulations. See T.D. 8417, 1992-1 C.B. 173, 57 Fed. Reg. 20747 (May 15, 1992) (certain temporary passive loss regulations amended or adopted as final regulations); Notice of Proposed Rulemaking, PS-1-89, 1992-1 C.B. 1219, 57 Fed. Reg. 20802 (May 15, 1992) (the 1992 proposed regulations). Because the special definition would not be necessary if shareholders generally participated in C corporation activities, the Commissioner's failure to remove that definition when he promulgated the 1992 proposed regulations further suggests that shareholders did not generally participate in C corporation activities under those regulations.

The Commissioner has long recognized the value of effective date and transitional rule relief in the section 469 setting. When the recharacterization rule was first promulgated as part of the 1988 temporary regulations, the Commissioner ensured it would not be applied retroactively, because "taxpayers could not clearly foresee the particular recharacterization rules that these regulations would adopt".  See T.D. 8175, 1988-1 C.B. 191, 53 Fed. Reg. 5686 (Feb. 25, 1988), at "Supplementary Information: Significant Policy Issues; XVI. Recharacterization of Certain Passive Activity Gross Income".  Also, when the Commissioner allowed the activity definition in the 1989 temporary regulations to "sunset" he published the 1992 proposed regulations to take its place; the 1992 proposed regulations stated that they would apply only to tax years ending after their date of publication. See Notice of Proposed Rulemaking, PS-1-89, 57 Fed. Reg. 20802, 20803 (May 15, 1992).

The 1988 and 1989 temporary regulations expressly provided that a shareholder could not participate in the activities of his C corporations.  By contrast, the 1992 proposed regulations were silent on this issue.  For the reasons set forth above, taxpayers could not have inferred from this silence that the Commissioner had changed the prior rules to provide that shareholders participate in the activities of their C corporations under the 1992 proposed regulations.

More importantly, notwithstanding any contrary inferences that might have been drawn, it is clear that the activity definition contained in the 1994 final regulations was the first activity rule expressly providing that a shareholder participated in his C corporation's activities.  I repeat the observation we made in Schwalbach v. Commissioner, 111 T.C. at 226, about the new 1994 activity definition:

> the change in language from the proposed regulations was substantial; up until the final regulations, the Commissioner had not publicly taken the position that an individual's activities could include activities conducted through a C corporation.

I also repeat that in Schwalbach we never questioned that this 1994 change was a prerequisite to the recharacterization of rental income received by the shareholder of a C corporation.

In promulgating the 1994 final regulations containing this substantial change, the Commissioner once again recognized the importance of transitional relief.  The 1994 final regulations provided that taxpayers could determine their tax liability for years ending after May 10, 1992, and beginning before October 4, 1994, under the 1992 proposed regulations if they so chose, rather than under the final regulations.  See 59 Fed. Reg. 50485, 50486-50487 (Oct. 4, 1994).

It would be inconsistent with this grant of transitional relief to hold to their detriment that shareholders participated in the activities of their C corporations under the 1992 proposed regulations.  Taxpayers could not learn or infer, from reading

the 1992 proposed regulations, that shareholders participated in the activities of their C corporations. Moreover, the addition of an express attribution rule to the 1994 final regulations was a significant change from those proposed regulations. The only possible purpose of the transitional rule contained in the 1994 final regulations was to protect taxpayers from this type of unanticipated change during the interim period.

The Commissioner has abused the regulatory process in backing and filling on the transitional rule issue in this case and in previous cases. Having with one hand granted transitional relief in the 1994 final regulations by allowing C corporation shareholders for 1993-94 to apply the 1992 proposed regulations, the Commissioner should not be able to take it away with the other, through statutory notices and litigation.

I would hold that shareholders who received net rental income from their C corporations--during years to which the 1992 proposed regulations apply--are not subject to the recharacterization rule. The majority's holding to the contrary is incorrect.

CHABOT, PARR, WHALEN, HALPERN, GALE, and MARVEL, JJ., agree with this concurring in part and dissenting in part opinion.