T.C. Memo. 2002-35

UNITED STATES TAX COURT

SIDNEY C. SHAW, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 2799-00.                    Filed February 6, 2002.

<u>H. Craig Pitts</u>, for petitioner.

<u>Edith F. Moates</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

COHEN, <u>Judge</u>:  Respondent determined deficiencies and accuracy-related penalties with respect to petitioner's Federal income tax as follows:

|  | | Penalty, I.R.C. |
| <u>Year</u> | <u>Deficiency</u> | <u>Sec. 6662(a)</u> |
| 1995 | $75,255 | $15,051 |
| 1996 | 103,514 | 20,703 |

The issues presented are: (1) Whether losses claimed by petitioner are subject to the passive activity loss limitations under section 469 and (2) whether petitioner is liable for the accuracy-related penalty under section 6662(a). Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue.

## FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulated facts are incorporated in our findings by this reference. Petitioner resided in Stillwater, Oklahoma, at the time of filing the petition. He owned real estate investment properties, interests in various business entities, gasoline-hauling trailers, and an airplane.

Petitioner researched properties and operational businesses. He developed a business model and consulted with his banker, construction supervisor, and operations managers. He either purchased the property individually or purchased the property indirectly through an entity in which he held an ownership interest. Petitioner then developed the land, renovated the existing building, or inventoried the property for future development. Petitioner leased many of his properties to Shaw's Gulf, Inc. (Shaw's Gulf), or its affiliates, and Shaw's Gulf managed the day-to-day business operations.

Shaw's Gulf

Petitioner was a 44.9-percent shareholder of Shaw's Gulf and was its president during the years in issue. As president, petitioner reviewed the monthly financial statements, approved the annual budget, approved the remodeling projects, and signed the checks. Shaw's Gulf paid petitioner compensation of $64,883.62 and $64,884.00 for 1995 and 1996, respectively, for his services related to Shaw's Gulf.

Shaw's Gulf was in the business of operating convenience stores, gas stations, carwashes, and Western Sizzlin' restaurants. During the years in issue, Shaw's Gulf leased properties from petitioner and managed the operations of the businesses located on those properties. The convenience stores that were leased from petitioner and operated by Shaw's Gulf were: Buy N Bye #2, Buy N Bye #6, Buy N Bye #7, Buy N Bye #12, Buy N Bye #13, and Conoco Cmart #16. Shaw's Gulf also rented an office building located in Stillwater from petitioner that was used as Shaw's Gulf's headquarters. In 1996, Shaw's Gulf also leased from petitioner and operated a Western Sizzlin' restaurant located in Ponca City, Oklahoma (Western Sizzlin' PC), and a convenience store with a large carwash located in Ponca City. Shaw's Gulf paid gross rents to petitioner of $739,875 and $976,954 for 1995 and 1996, respectively.

In addition to the real estate that Shaw's Gulf leased from petitioner, Shaw's Gulf also leased properties from entities in which petitioner held an ownership interest. During the years in issue, Shaw's Gulf operated Texaco Food Mart #5, a gas station and convenience store, that was leased from RS&M Properties II (RS&M). Petitioner was a 55-percent partner and the designated tax matters partner of RS&M during the years in issue.

Shaw's Gulf leased Buy N Bye #10, a convenience store, from R&S Partnership (R&S). Petitioner was a 50-percent partner of R&S during the years in issue, and petitioner contributed the Bye N Bye #10 convenience store to R&S sometime prior to the years in issue.

In 1996, Shaw's Gulf leased the Western Sizzlin' restaurant located in Stillwater (Western Sizzlin' SW) from S.C. Shaw, Ltd. (Shaw Ltd.), an S corporation of which petitioner was the sole shareholder.

Shaw's Gulf operated a convenience store at a truck stop located in Billings, Oklahoma, that was owned by Luttrell Oil Company (Luttrell). Petitioner was a shareholder and president of Luttrell during the years in issue. He reviewed the financial statements and tax bills of Luttrell, but he did not have much involvement in the day-to-day operations of Luttrell.

Petitioner's compensation from Luttrell was $34,718.30 and $34,872.00 for 1995 and 1996, respectively.

Shaw's Gulf also leased and operated four other convenience stores in which petitioner held no direct nor indirect ownership interest in the property.

Barden Kellum (Kellum), vice president of operations, managed the day-to-day operations of Shaw's Gulf and its affiliates and was responsible for the maintenance of the properties leased by Shaw's Gulf. Kellum consulted with petitioner either by telephone or in person approximately 3 to 5 hours a week.

Shaw's Gulf also leased a house located in Stillwater from R&S. Petitioner contributed the house to R&S sometime prior to the years in issue. Kellum was not responsible for any of the residential rentals because petitioner hired an agency to manage the residential rentals.

C&A Trucking

C&A Trucking was a subsidiary of Shaw's Gulf. C&A Trucking was in the transportation business; on a call-and-carry basis, it delivered petroleum products. About 25 to 35 percent of C&A Trucking's business was from Shaw's Gulf. Stephen Shaw, general manager of C&A Trucking, managed the day-to-day business operations, dispatch, and billing.

Petitioner was a shareholder and the president of C&A Trucking during the years in issue. Petitioner was not involved in the day-to-day operations of C&A Trucking but did meet with Stephen Shaw for about 3 hours three times a month to review the numbers, sign the checks, and review the business volume. C&A Trucking paid petitioner compensation of $16,180.50 and $16,221.00 in 1995 and 1996, respectively, for his services related to C&A Trucking.

C&A Trucking rented gasoline-hauling trailers (Over the Road Trailers) and a warehouse located in Stillwater from petitioner. C&A Trucking paid petitioner gross rents of $172,251 and $313,657 in 1995 and 1996, respectively.

Shaw Ltd.

Petitioner was the sole shareholder of Shaw Ltd., which was an S corporation, during the years in issue. During the years in issue, Shaw Ltd. was in the business of operating a Dairy Queen restaurant. In 1995, Shaw Ltd. owned and operated the Western Sizzlin' SW restaurant that was later leased to and operated by Shaw's Gulf in 1996.

The Dairy Queen restaurant was built and opened for business in 1994. Shaw Ltd. owned the building and the equipment of the Dairy Queen restaurant, but the land on which the Dairy Queen restaurant stood was leased from SDQ LLC. Petitioner was a

33.33-percent member and the designated tax matters partner of SDQ LLC during the years in issue. The day-to-day operations of the Dairy Queen restaurant were managed by Kent Russell (Russell).

Petitioner renovated the Dairy Queen restaurant in 1995. Petitioner purchased a new cash register system and added a salad display case. The renovations consisted of relocating the fountain area to create a separate area for customers to get their drinks, installing new tile, and adding a mop sink closet. The renovation work was done at night so that the restaurant could remain open.

During the first 14 weeks of 1995, petitioner was involved in the renovation project and operations of the Dairy Queen restaurant. He spent about 7 hours a week at the restaurant busing tables, cooking hamburgers, and fixing the balls in the playroom. Petitioner met with Russell every morning to review the food and labor costs. After the first 14 weeks of 1995, petitioner spent about 3 hours a day at the restaurant observing operations. In 1996, petitioner spent about 3 hours a week at the Dairy Queen restaurant.

Petitioner contributed Western Sizzlin' SW to Shaw Ltd. in May 1995. In 1996, Shaw Ltd. leased Western Sizzlin' SW to Shaw's Gulf, and Shaw's Gulf took over the business operations of

Western Sizzlin' SW.  Bob Palmer (Palmer), manager of Western Sizzlin' SW, continuously managed the day-to-day operations of the Western Sizzlin' SW restaurant during the years in issue.

In 1995, Shaw Ltd. made renovations to Western Sizzlin' SW. The renovations consisted of expanding the seating area, extending the entry to create a cashier area, relocating the restrooms, adding a cleaning closet, and expanding the parking lot.  The renovation work was done at night so that the restaurant could remain open.

Petitioner met with Palmer regularly, about 14 hours a week during the 15-week construction period, to discuss the renovations and business operations of the Western Sizzlin' SW restaurant.  Petitioner made the final decisions on the operations and policy of the Western Sizzlin' SW restaurant, including the type of food served, the meat quality, the seasoning used on the steaks, the use of a vacuum tumbler to marinate the steaks, the baking of fresh bread, the addition of scatter bars throughout the restaurant, and the addition of a cotton candy machine and desserts to the buffet.  After the renovations were completed in August 1995, petitioner met with Palmer occasionally, about 3 hours a week, to review and discuss the financial statements.  In 1996, petitioner ate dinner at the restaurant 3 nights a week.

Gregory Webb (Webb), an employee of Shaw's Gulf, was the construction supervisor responsible for overseeing the day-to-day construction of the Dairy Queen and Western Sizzlin' SW remodeling projects.  Webb worked with petitioner on the design, drawings, and cost of the projects.  Petitioner approved all of the details of the renovation projects, set up lines of credit with vendors, found subcontractors, set up the bank account, and signed the checks for the cost of construction.  During construction, Webb met with petitioner for about an hour on a daily basis to discuss the progress and problems encountered on the remodeling projects.

Petitioner took trips for the purpose of improving his business operations.  He attended conventions, observed the operations and facilities of other restaurants, and met with other franchise owners.  The trips he took in his airplane are documented in his airplane flight log.  The airplane flight log recorded the dates of travel, points of departure and arrival, hours of flight duration, and remarks on the purpose of the trips.  Petitioner's flight and travel time that related to Shaw Ltd. was 110 hours in 1995.  Petitioner kept calendars for the years in issue, but they were discarded at the end of each calendar year.

Lease Agreements

Petitioner usually represented both sides of the lease transactions between himself and Shaw's Gulf. Petitioner signed the lease agreements as the legal owner of the property, as lessor, and as the legal representative of Shaw's Gulf, as lessee, for the following properties: Buy N Bye #2, Buy N Buy #6, Buy N Buy #7, Buy N Bye #12, Buy N Bye #13, Western Sizzlin' PC, and the airplane. Kellum signed as the legal representative of Shaw's Gulf, as lessee, on the leases for Western Sizzlin' SW, Conoco Cmart #16, and the office building located in Stillwater.

Petitioner had an appraisal done for each property he owned and used the appraisal to determine the rental price. He generally set the rental price based on the appraisal value and added a 12-percent return. Kellum and Webb calculated the numbers that assisted petitioner in determining whether he could own, develop, and lease a particular property to Shaw's Gulf. Kellum typed some of the lease documents but did not research what the fair rental value of properties would have been.

The lease agreements included the land, building, fixtures, and equipment at the specified location. The lease agreements also provided that Shaw's Gulf would be responsible for the repairs and maintenance of each property and that improvements made by the lessee would revert to the lessor upon termination of the lease. The lease agreements for Buy N Bye #2, Buy N Bye #6,

Buy N Bye #7, Buy N Bye #12, Buy N Bye #13, Conoco Cmart #16, and the office building located in Stillwater provide:

> Lessee covenants and agrees to carry and maintain the buildings, equipment, and improvements upon the said premises in the same conditions as they now are and to deliver the same to the Lessor upon the termination of this lease in the same condition in which they are now, normal and usual wear and tear alone expected. Lessee may construct additions and improvements upon the premises, which said additions and improvements are to be maintained at Lessee's expense to the termination of the lease when they become property of the Lessor.

The lease agreement for Western Sizzlin' PC provides:

> REPAIRS. The LESSEE shall, at its own expense, make all necessary repairs and replacements to the Leased Premises * * * fixtures and all other appliances and their appurtenant equipment * * *

> ALTERATIONS AND IMPROVEMENTS. * * * All additions, alterations and improvements made in or to the leased premises by either the LESSOR or the LESSEE, shall become property of the LESSOR and be surrendered with the Leased Premises at the termination of the Lease. * * *

Airplane Lease Activity

Petitioner purchased a new TBM 700, single engine, propeller airplane in 1993. Petitioner leased the airplane to Shaw's Gulf during the years in issue. Petitioner signed the lease agreement, as lessor, and as the president of Shaw's Gulf, as lessee. The lease agreement provided that "Shaw Gulf, Inc. shall keep the airplane in good condition and shall make all repairs necessary for its good operation at * * * [its] own expense" and required monthly rental payments of $7,000. The lease agreement also required Shaw's Gulf to insure the airplane against loss.

Shaw's Gulf deducted the rental expense and all the repairs and maintenance expense relating to the airplane. Petitioner included the rental income and deducted the mortgage interest and depreciation expense related to the airplane.

Tax Reporting

Petitioner's individual tax return and the tax returns of petitioner's business entities were prepared by petitioner's accountant, who was a certified public accountant, tax practitioner, and had a real estate background. Petitioner met with his accountant regularly and discussed his business activities.

On petitioner's Schedule E, Supplemental Income and Loss, he reported income and losses from his ownership interests as nonpassive:

| Entity | 1995 | 1996 |
|--------|------|------|
| RS&M | $29,814 | $29,814 |
| R&S | 27,869 | 25,236 |
| SDQ LLC | 21,981 | 19,247 |
| Shaw, Ltd. | (139,623) | (108,691) |
| Net nonpassive income/(loss) | $(59,959) | $(34,394) |

Based on petitioner's assumption that he qualified as a real estate professional under section 469(c)(7), petitioner reported his net income and loss from his rental property on Schedule E as nonpassive:

| Property | 1995 | 1996 |
|---|---|---|
| Over the Road Trailers | $22,357 | $16,489 |
| Warehouse (Stillwater) | 600 | 600 |
| Buy N Bye #7 | 32,128 | 34,791 |
| Buy N Bye #6, #12, #13 | 306,272 | 330,688 |
| Conoco Cmart #16 | 52,644 | 87,868 |
| Office building (Stillwater) | (6,838) | 20,688 |
| Carwash (Ponca City) | -- | 21,000 |
| Buy N Bye #2 | (24,856) | (14,446) |
| Western Sizzlin' PC | -- | (114,811) |
| Airplane | (355,147) | (255,096) |
| Total nonpassive income/(loss) | $27,160 | $127,771 |

Petitioner did not attach to his 1995 or 1996 tax return an election to treat all interests in rental real estate as a single rental real estate activity.

Notice of Deficiency

Respondent's examination of petitioner's tax liability commenced on May 13, 1997. A statutory notice of deficiency for 1995 and 1996 was mailed to petitioner on December 8, 1999. In the notice of deficiency, respondent disallowed petitioner's losses for 1995 and 1996.

OPINION

Respondent reclassified petitioner's Schedule E activities from nonpassive to passive activities and disallowed the losses claimed by petitioner based on the passive loss limitations under section 469. In deciding whether petitioner is allowed to deduct his losses, we must address multiple issues. The deductibility of the losses from petitioner's ownership interest in Shaw Ltd. depends on whether petitioner materially participated in Shaw

Ltd. The deductibility of the losses from his rental properties depends on: (1) Whether petitioner had net income from self-rented property under section 1.469-2(f)(6), Income Tax Regs.; (2) whether petitioner qualifies as a real estate professional under section 469(c)(7); and (3) whether petitioner's airplane lease activity was a passive activity under section 469(c)(2).

Section 469 generally disallows for the taxable year any passive activity loss. Sec. 469(a). A passive activity loss is defined as the excess of the aggregate losses from all passive activities for the taxable year over the aggregate income from all passive activities for that year. Sec. 469(d)(1). A passive activity is any trade or business in which the taxpayer does not materially participate. Sec. 469(c)(1). Rental activity is treated as a per se passive activity regardless of whether the taxpayer materially participates. Sec. 469(c)(2), (4). Under section 469(c)(7)(B), the rental activities of a taxpayer in the real property business (real estate professional) are not per se passive activities under section 469(c)(2) but are treated as a trade or business and subject to the material participation requirements of section 469(c)(1).

Petitioner contends, for the first time in his posttrial brief, that he is entitled to deduct his losses in 1995 and 1996 because Shaw's Gulf, Shaw Ltd., petitioner's real estate rental activities, and petitioner's airplane lease activity constitute a

single trade or business activity in which petitioner materially participated.

Respondent argues that petitioner's desire to combine his various activities into a single trade or business activity under section 1.469-4(c), Income Tax Regs., represents a new issue that cannot be raised for the first time on brief. Respondent asserts that to permit petitioner to raise this new issue on brief would result in unfairness, surprise, and prejudice to respondent.

We have held that issues raised for the first time on brief will not be considered by the Court when surprise and prejudice are found to exist. See Seligman v. Commissioner, 84 T.C. 191, 198-199 (1985), affd. 796 F.2d 116 (5th Cir. 1986). Petitioner had numerous opportunities to raise his new theory, and the failure to raise this issue when he could have done so waives the argument. See Aero Rental v. Commissioner, 64 T.C. 331, 338 (1975). Petitioner's attempt to regroup his activities is belated and will not be accepted. In any event, his argument is factually and legally flawed under section 1.469-4(e)(1), Income Tax Regs., and section 1.469-4(d)(2), Income Tax Regs.

Respondent alternatively argues that petitioner's proposed grouping of activities is inconsistent with petitioner's actual grouping of activities as reported in 1994, 1995, and 1996. Section 1.469-4(e)(1), Income Tax Regs., states, in general, that "once a taxpayer has grouped activities under this section, the

taxpayer may not regroup those activities in subsequent taxable years". Respondent also explains that petitioner is unable to group his real estate rental activities with his airplane activity because, under section 1.469-4(d)(2), Income Tax Regs., an "activity involving the rental of real property and an activity involving the rental of personal property * * * may not be treated as a single activity". We agree with respondent.

Material Participation in Shaw Ltd.

Respondent reclassified the income and loss from petitioner's Schedule E ownership interests from nonpassive to passive activities and disallowed the net passive loss of $59,959 and $34,394 in 1995 and 1996, respectively, pursuant to section 469:

| Entity | 1995 | 1996 |
|---|---|---|
| RS&M | $29,814 | $29,814 |
| R&S | 27,869 | 25,236 |
| SDQ LLC | 21,981 | 19,247 |
| Shaw Ltd. | (139,623) | (108,691) |
| Net passive income/(loss) | $(59,959) | $(34,394) |

The effect of respondent's reclassification was to disallow a portion of the losses from Shaw Ltd. Petitioner can deduct the losses from his ownership interest in Shaw Ltd. of $139,623 and $108,691 in 1995 and 1996, respectively, if petitioner can demonstrate that he materially participated in Shaw Ltd. during 1995 or 1996.

Material participation is defined as involvement in the operations of an activity that is regular, continuous, and substantial. Sec. 469(h)(1). As explained in section 1.469-5T(a), Temporary Income Tax Regs., 53 Fed. Reg. 5725 (Feb. 25, 1988), a taxpayer can satisfy the material participation requirement if the individual meets any one of the seven regulatory tests:

> (1) The individual participates in the activity for more than 500 hours during such year;
>
>     \*     \*     \*     \*     \*     \*     \*
>
> (4) The activity is a significant participation activity * * * for the taxable year, and the individual's aggregate participation in all significant participation activities during such year exceeds 500 hours;
>
>     \*     \*     \*     \*     \*     \*     \*
>
> (7) Based on all of the facts and circumstances * * *, the individual participates in the activity on a regular, continuous, and substantial basis during such year.

"Participation" generally means any work done in an activity by an individual who owns an interest in the activity. Sec. 1.469-5(f)(1), Income Tax Regs. Work done by the individual is not treated as participation in the activity if such work is not of a type that is customarily done by an owner of such activity and one of the principal purposes for performing such work is to avoid the passive activity limitations of section 469.

Sec. 1.469-5T(f)(2)(i), Temporary Income Tax Regs., 53 Fed. Reg. 5726 (Feb. 25, 1988).

Work done by an individual in the individual's capacity as an investor in an activity is not treated as participation in the activity for purposes of this section unless the individual is directly involved in the day-to-day management or operations of the activity. Sec. 1.469-5T(f)(2)(ii)(A), Temporary Income Tax Regs., 53 Fed. Reg. 5727 (Feb. 25, 1988). Work done as an investor includes: (1) Studying and reviewing financial statements or reports on operations of the activity; (2) preparing or compiling summaries or analyses of the finances or operations of the activity for the individual's own use; and (3) monitoring the finances or operations of the activity in a nonmanagerial capacity. Sec. 1.469-5T(f)(2)(ii)(B), Temporary Income Tax Regs., supra.

Petitioner contends that in 1995 he met the 500-hour requirement under section 1.469-5T(a)(1), Temporary Income Tax Regs., supra, and in 1996 his participation in significant participation activities exceeded 500 hours under section 1.469-5T(a)(4), Temporary Income Tax Regs., 53 Fed. Reg. 5726 (Feb. 25, 1988). Respondent argues: (1) Petitioner failed to establish by reasonable means the hours he devoted to Shaw Ltd. and (2) petitioner's activities that were related to Shaw Ltd.

consisted of investor type activities that are not treated as participation in an activity.

With respect to the evidence that may be used to establish hours of participation, section 1.469-5T(f)(4), Temporary Income Tax Regs., 53 Fed. Reg. 5727 (Feb. 25, 1988), provides:

> The extent of an individual's participation in an activity may be established by any reasonable means. Contemporaneous daily time reports, logs, or similar documents are not required if the extent of such participation may be established by other reasonable means. Reasonable means for purposes of this paragraph may include but are not limited to the identification of services performed over a period of time and the approximate number of hours spent performing such services during such period, based on appointment books, calendars, or narrative summaries.

While the regulations are somewhat ambiguous concerning the records to be maintained by taxpayers, they do not allow a postevent "ballpark guesstimate". Carlstedt v. Commissioner, T.C. Memo. 1997-331; Speer v. Commissioner, T.C. Memo. 1996-323; Goshorn v. Commissioner, T.C. Memo. 1993-578. Petitioner's recollection and estimate of the hours that he participated in Shaw Ltd. are reasonable and are corroborated by the testimony of Webb and Palmer. However, based on the description of the activities that petitioner performed, the hours that are related to investor type activities such as monitoring the operations and reviewing financial statements are not treated as participation because petitioner was not involved in the day-to-day operations of the restaurants. Rather, the day-to-day operations of the

Dairy Queen restaurant were managed by Russell and the day-to-day operations of Western Sizzlin' SW were managed by Palmer. The activities that will be considered as participation in Shaw Ltd. are petitioner's involvement in the renovations and initial operations of his restaurants in 1995. Petitioner spent about 7 hours a week during the 14-week construction period on activities related to the Dairy Queen restaurant, or 98 hours, and he spent about 14 hours a week during a 15-week construction period on activities related to the Western Sizzlin' SW restaurant, or 210 hours. Petitioner's flight and travel time related to Shaw Ltd. was 110 hours in 1995. Petitioner's 418 hours of participation in Shaw Ltd. do not meet the material participation test for 1995. Petitioner has conceded that he did not participate in Shaw Ltd. for 500 hours in 1996.

Petitioner's argument that he spent more than 500 hours in significant participation activities in 1996 impermissibly combines his hours of participation in Shaw Ltd. with his hours of participation in his rental activities. Section 1.469-5T(c)(1)(i), Temporary Income Tax Regs., 53 Fed. Reg. 5726 (Feb. 25, 1988), provides that a significant participation activity must be a trade or business activity, not a rental activity.

Rental Activities

Petitioner reported his property rentals as nonpassive activities during the years in issue based on the assumption that he qualified as a real estate professional under section 469(c)(7).  Respondent determined that petitioner was not a real estate professional and reclassified petitioner's rental activities as passive activities.

Respondent also determined that the properties leased to Shaw's Gulf and C&A Trucking were self-rented properties pursuant to section 1.469-2(f)(6), Income Tax Regs.  The self-rented property rule contained in section 1.469-2(f)(6), Income Tax Regs., states:

> Property rented to a nonpassive activity.  An amount of the taxpayer's gross rental activity income for the taxable year from an item of property equal to the <u>net rental activity income</u> for the year from that item of property is treated as not from a passive activity if the property--
>
>      (i) Is rented for use in a trade or business activity * * * in which the taxpayer materially participates * * * for the taxable year * * * [Emphasis added.]

Under the self-rented property rule, the net rental income from self-rented property is treated as nonpassive income and the net rental losses are treated as passive losses, even though the rental activities are passive activities.  Respondent reclassified the net rental income from the following properties as nonpassive:

| Property | 1995 | 1996 |
|---|---|---|
| Over the Road Trailers | $22,357 | $16,489 |
| Warehouse (Stillwater) | 600 | 600 |
| Buy N Bye #7 | 32,128 | 34,791 |
| Buy N Bye #6, #12, #13 | 306,272 | 330,688 |
| Conoco Cmart #16 | 52,644 | 87,868 |
| Office building (Stillwater) | -- | 20,688 |
| Carwash (Ponca City) | -- | 21,000 |
| Total nonpassive income | $414,001 | $512,124 |

The result to petitioner is that his passive losses from his other rental properties are subject to the passive loss limitations under section 469. The following rental losses were disallowed by respondent:

| Property | 1995 | 1996 |
|---|---|---|
| Buy N Bye #2 | $24,856 | $14,446 |
| Office building (Stillwater) | 6,838 | -- |
| Western Sizzlin' PC | -- | 114,811 |
| Airplane | 355,147 | 255,096 |
| Total passive losses | $386,841 | $384,353 |

Petitioner contends that the application of section 1.469-2(f)(6), Income Tax Regs., is arbitrary, capricious, and contrary to the Code because similarly situated properties are treated differently solely on the basis of whether they show a profit or loss for the year. Petitioner argues that the regulations produce an inequitable result and are not appropriate where multiple properties are leased to a single business enterprise.

This Court has previously addressed the validity of section 1.469-2(f)(6), Income Tax Regs., and held that the recharacterization of net income from self-rented property was

not arbitrary, capricious, or manifestly contrary to the statute. Krukowski v. Commissioner, 114 T.C. 366, 369-370 (2000); Schwalbach v. Commissioner, 111 T.C. 215, 219-224 (1998); see also Sidell v. Commissioner, T.C. Memo. 1999-301, affd. 225 F.3d 103 (1st Cir. 2000). Congress granted the Secretary of the Treasury the authority to prescribe regulations as may be necessary or appropriate to carry out the provisions of section 469, including regulations "which specify what constitutes an activity, material participation, or active participation for purposes of this section, * * * [and] requiring net income or gain from a limited partnership or other passive activity to be treated as not from a passive activity". Sec. 469(l)(1), (3). In Krukowski v. Commissioner, supra at 369, the Court stated:

> We disagree with petitioner that the recharacterization rule is invalid. The recharacterization rule is a legislative regulation, see Schwalbach v. Commissioner, 111 T.C. 215, 220 (1998) (the Secretary had to comply with the Administrative Procedure Act (APA), 5 U.S.C. sec. 553(b) and (c) (1994), when he prescribed sec. 1.469-2(f)(6), Income Tax Regs., because the rules contained therein are legislative rather than interpretive); see also Fransen v. United States, 191 F.3d 599, 600 (5th Cir. 1999); thus, it is invalid only if it is arbitrary, capricious, or manifestly contrary to the statute, see Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 844 (1984); see also McKnight v. Commissioner, 99 T.C. 180, 183 (1992) [affd. 7 F.3d 182 (5th Cir. 1993)].

> The recharacterization rule is not arbitrary, capricious, or manifestly contrary to the statute. It was prescribed by the Secretary pursuant in part to the specific grant of authority stated in section 469(l)

that allows him to prescribe all necessary or
appropriate regulations to carry out the provisions of
section 469 * * * [Fn. ref. omitted.]

The Court cited the following passage from the legislative

history to support its holding:

The conferees intend that this authority be exercised
to protect the underlying purpose of the passive loss
provision, i.e., preventing the sheltering of positive
income sources through the use of tax losses derived
from passive business activities.

Examples where the exercise of such authority may
(if the Secretary so determines) be appropriate include
the following * * * (2) related party leases or sub-
leases, with respect to property used in a business
activity, that have the effect of reducing active
business income and creating passive income * * *.
[H. Conf. Rept. 99-841, at 147 (1986), 1986-3 C.B.
(Vol. 4) 147.]

Petitioner argues that the Court has not previously

considered the inequity of recharacterizing net income from

self-rented properties where self-rented properties with losses

are not recharacterized.  We disagree.  The taxpayers in Sidell

v. Commissioner, supra, faced a similar situation where one self-

rented property generated a net loss and the other self-rented

properties generated net income.  The taxpayers argued that the

properties were either contiguous to or located across the street

from each other and that the ownership of the properties was

separate from the business for valid business reasons.  The Court

held that section 1.469-2(f)(6), Income Tax Regs., was valid

pursuant to the Secretary's delegated regulation-making authority.

Without the application of section 1.469-2(f)(6), Income Tax Regs., taxpayers would be able to substitute passive income from self-rented properties for nonpassive income, such as wages or dividends from a personal service or closely held corporation, in order to offset their passive losses from other activities. Where the taxpayer controls both sides of the transaction, such arrangements require special scrutiny.

We do not agree with petitioner that section 1.469-2(f)(6), Income Tax Regs., has produced an inequitable result. Petitioner is a sophisticated businessperson who owned multiple properties, held ownership interests in several businesses, and served as the president of Shaw's Gulf and C&A Trucking. Petitioner controlled both sides of the rental transactions between himself, individually, as lessor, and as an officer of the respective businesses, as lessee. As lessor, he knew the appraised value, the mortgage interest expense, and the depreciation expense on each property. He had control over establishing the amount of rent and chose a 12-percent return. Petitioner had nontax business reasons for retaining ownership of the rental properties individually and outside of his businesses.

Petitioner must accept the tax consequences of his business decisions and the manner in which he chose to structure his

business transactions.  The Supreme Court has observed that "while a taxpayer is free to organize his affairs as he chooses, nevertheless, once having done so, he must accept the tax consequences of his choice, whether contemplated or not and may not enjoy the benefit of some other route he might have chosen to follow but did not."  Commissioner v. Natl. Alfalfa Dehydrating & Milling Co., 417 U.S. 134, 148-149 (1974) (citations omitted).

We sustain respondent's determination that the net rental income from the real estate properties rented to Shaw's Gulf and C&A Trucking should be reclassified as nonpassive income.

Petitioner argues, in the alternative, that his real estate activities were nonpassive activities because he qualifies as a real estate professional under section 469(c)(7) and his real estate rental activities are a trade or business in which he materially participated.

Respondent disallowed the following real estate rental losses based on the passive loss limitations under section 469:

| Property | 1995 | 1996 |
|----------|------|------|
| Buy N Bye #2 | $24,856 | $14,446 |
| Office building (Stillwater) | 6,838 | -- |
| Western Sizzlin' PC | -- | 114,811 |
| Total passive losses | $31,694 | $129,257 |

Respondent maintains that the real estate rental activities generating a net loss are per se passive activities under section 469(c)(2) because petitioner has not presented adequate evidence

to support his assertion that he was a real estate professional pursuant to section 469(c)(7) in either 1995 or 1996 or to support a finding that he materially participated in each of the real estate properties.

Under section 469(c)(7)(B), a taxpayer qualifies as a real estate professional and is not engaged in a passive activity under section 469(c)(2) if:

(i) more than one-half of the personal services performed in trades or businesses by the taxpayer during such taxable year are performed in real property trades or businesses in which the taxpayer materially participates, and

(ii) such taxpayer performs more than 750 hours of services during the taxable year in real property trades or businesses in which the taxpayer materially participates.

Thus, if the taxpayer qualifies as a real estate professional, the rental activities of the real estate professional are exempt from classification as a passive activity under section 469(c)(2). Instead, the real estate professional's rental activities are treated as a passive activity under section 469(c)(1) unless the taxpayer materially participated in the activity. Sec. 1.469-9(e)(1), Income Tax Regs. For purposes of determining whether a taxpayer materially participated in a trade or business, this requirement must be met with respect to each interest in rental real estate unless the taxpayer makes an election to treat all interests in rental real estate as a single

rental real estate activity. Sec. 469(c)(7)(A); sec. 1.469-9(e)(1), Income Tax Regs. Petitioner did not make a timely election to treat all interests in rental real estate as a single rental real estate activity.

Real property trades or businesses are defined in section 469(c)(7)(C) as "any real property development, redevelopment, construction, reconstruction, acquisition, conversion, rental, operation, management, leasing, or brokerage trade or business." A trade or business includes being an employee. Putoma Corp. v. Commissioner, 66 T.C. 652, 673 (1976), affd. 601 F.2d 734 (5th Cir. 1979).

Petitioner asserts that he devoted more than 750 hours to real property trades or businesses because his "activities show a meaningful involvement in real property trades or business" and he bases this on the following: (1) He was the general contractor on three projects in 1995 and two projects in 1996; (2) he spent a significant amount of time looking for additional real estate to purchase; (3) he owned 20 real estate properties in 1995 and 21 in 1996; (4) he purchased five real estate properties in 1995 and four in 1996; (5) he sold two parcels of real estate in 1995; and (6) he spent over $395,870 and $597,000 in construction costs in 1995 and 1996, respectively. The number of properties owned, sold, or purchased or the amount of money

spent on construction costs does not quantify the number of hours that petitioner spent on real estate activities.

Petitioner attempted to recollect his participation in his real estate activities at trial and attempted to summarize his estimates from trial in his brief. Petitioner asserts that his hours of participation in his real estate activities were 1,425.5 and 1,494.4 in 1995 and 1996, respectively.

Respondent argues that petitioner has not established by reasonable means that he spent more than 750 hours in real property trades or businesses. We agree. Petitioner has not recorded the number of hours spent in any activity and has discarded his calendars. His attempt to reconstruct or estimate his hours through testimony such as that described above produces a generalized description of his activities and a vague approximation--or "ballpark guesstimate"--of his hours. His testimony regarding his real estate activities is inadequate and unpersuasive under the circumstances. His estimated hours of participation in real estate activities are unreasonable.

The airplane flight logs that document petitioner's flight time would be a credible source and reasonable means to demonstrate petitioner's activities and hours spent in real estate activities; however, petitioner's flight time that was related to his real estate activities in 1995 and 1996 does not

provide a sufficient number of hours to meet the 750-hour participation requirement.

Because petitioner does not meet the 750-hour requirement of section 469(c)(7)(B)(ii), he is not a real estate professional for purposes of section 469(c)(7)(A), and his real estate rental activities are treated as passive activities under section 469(c)(2). As such, it is not necessary for us to address whether petitioner spent more than 50 percent of his time in real estate trades or businesses or whether he materially participated in each real estate rental. Even so, the lease agreements executed by petitioner would not require much involvement by petitioner during the lease term because the leased premises included the land, building, fixtures, and equipment, and the lessee was required to repair and maintain the property. Further, Kellum was responsible for the repairs and maintenance of the properties leased to Shaw's Gulf, and petitioner hired an agency to manage the residential rentals.

Airplane Lease Activity

Respondent disallowed the airplane rental losses of $355,147 and $255,096 in 1995 and 1996, respectively, and maintains that the leasing of personal property is a passive activity under section 469(c)(2) and subject to the passive activity loss limitations under section 469.

Petitioner argues that the airplane was an essential part of his real estate operations and that the costs he incurred should be allowable as trade or business expenses under section 162. Petitioner asserts that he used the airplane for the "professional chase of properties", such as the purchase of real estate, research to develop his properties, and attendance at business meetings.

A rental activity is a per se passive activity regardless of whether the taxpayer materially participates in the activity. Sec. 469(c)(2), (4). Rental activity, as defined in section 469(j)(8), is "any activity where payments are principally for the use of tangible property." Here, the rental of petitioner's airplane to Shaw's Gulf for monthly lease payments of $7,000 was a rental activity under section 469(j)(8) and, thus, a passive activity under section 469(c)(2).

Petitioner argues that, while, in form, the agreement is a lease, the substance of the transaction resembles an expense-sharing agreement with Shaw's Gulf, Shaw Ltd., and C&A Trucking. We disagree. The lease agreement did not provide for expense-sharing. Rather, the lease provided that the lessee would maintain and repair the airplane and insure the airplane against loss. Shaw's Gulf, as lessee, deducted the repairs and maintenance expenses related to the airplane.

Petitioner was on both sides of the transaction and reported the income and expense of the airplane lease activity as a rental activity on his Schedule E. Petitioner chose to structure and report his airplane leasing activity as a rental activity during the years in issue and must accept the tax consequences related to that form. See Commissioner v. Natl. Alfalfa Dehydrating & Milling Co., 417 U.S. 134, 148-149 (1974). He cannot belatedly recharacterize it to secure greater tax benefits. Id. We conclude that the airplane lease activity was a passive activity, and the rental losses are limited to the extent of passive activity income under section 469.

## Penalties

Section 6662(a) imposes a 20-percent accuracy-related penalty where the taxpayer's underpayment of tax is attributable to negligence or disregard of rules or regulations. See also sec. 6662(b).

Respondent determined that petitioner is liable for the accuracy-related penalty under section 6662(a) because petitioner was negligent in the preparation of his 1995 and 1996 tax returns. Respondent maintains that petitioner's tax returns contained errors, petitioner failed to maintain adequate books and records, and petitioner ignored the self-rental rules of section 1.469-2(f)(6), Income Tax Regs. Petitioner argues that he was not negligent, that he made a reasonable attempt to comply

with the provisions of the Internal Revenue Code, and that he took a position that was well founded in law and fact.

Good faith reliance on the advice of counsel or a qualified accountant can, in certain circumstances, be a defense to the accuracy-related penalty for negligence.  See Schwalbach v. Commissioner, 111 T.C. 215, 230-231 (1998); Ewing v. Commissioner, 91 T.C. 396, 423-424 (1988), affd. without published opinion 940 F.2d 1534 (9th Cir. 1991).

Petitioner consulted with his accountant who prepared his tax returns for the years in issue.  Petitioner's reliance on the representations of his accountant was reasonable.  We conclude that petitioner is not liable for the accuracy-related penalties imposed under section 6662.

We have considered all of the remaining arguments that have been made by petitioner for a result contrary to that expressed herein, and, to the extent not discussed above, they are without merit.

To reflect the foregoing,

> Decision will be entered for respondent as to the deficiencies and for petitioner as to the accuracy-related penalties.